## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 96-CA-01169-SCT

*ROBERT M. HOLLAND, JR.*

*v.*

*J.D. MAYFIELD, R. ROY WARD, ERIC E. LINDSTROM, JOHN T. FERGUSON, GEORGE C. WRIGHT, MARK MASSEY, MALCOLM CAMPBELL, BETTY CAMPBELL, ROBERT LINDSEY, JR., TOM SAUCIER, TOBIAS ROBINSKY, FLORINE PHILLIPS, ESTATE OF AL FORNEA AND DAVID McMULLAN*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/09/96 |
| TRIAL JUDGE: | HON. W.O. DILLARD |
| COURT FROM WHICH APPEALED: | JONES COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | C. TED SANDERSON, JR. |
| ATTORNEYS FOR APPELLEES: | WALTER J. BATLA |
| | GEORGE S. SHADDOCK |
| NATURE OF THE CASE: | CIVIL - TORTS - OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED - 6/3/1999 |
| MOTION FOR REHEARING FILED: | 7/7/99; denied 9/26/2002 |
| MANDATE ISSUED: | 10/3/2002 |

**EN BANC.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. Here, investors in oil and gas properties sued the person who solicited their investments alleging fraud. The Chancellor, sitting without a jury, awarded actual and punitive damages. Finding no reversible error, we affirm.

**I.**

¶2. The Appellees ("Investors") filed their Complaint in the Chancery Court of the Second Judicial District of Jones County against the Appellant ("Holland") on April 10, 1993. The lawsuit involved the Investors' investments in oil and gas properties. The Complaint alleged fraud on the part of Holland in connection with the investments in the Chandeleur Prospect, offshore Louisiana.

¶3. The Chandeleur Prospect consisted of offshore wells, including an operating well, and the opportunity of obtaining some blocks of leases for potential drilling. The wells were located in the Chandeleur Sound area offshore Louisiana.

¶4. The Investors testified that their understanding of the deal from Holland was that the Investors were buying the property at BT Operating Company's ("BT") cost, and that BT and Holland would get a reversionary interest on the back-end, after the Investors recovered their original investments. There were to be no front-end profits paid. The fact that there was no front-end cost built into the purchase price made the Chandeleur Prospect more attractive than other oil and gas deals.

¶5. At some point in 1990, one of the investors did an accounting of the project from BT's books because the Investors had been unable to get information from BT on how the project was going. From the accounting, it appeared that there were some discrepancies between what the Investors had paid into Chandeleur and what had actually been paid by BT for the property. The Investor who did the accounting testified that the Investors did not know exactly what had happened until approximately a year and a half after the accounting. Eventually, the Investors learned that BT had actually paid approximately $2.3 million for Chandeleur, while the Investors had been led to believe the cost was $3.1 million.

¶6. Around that same time, several of the Investors formed a corporation, Chandeleur Limited, for the purpose of taking over and operating the Chandeleur Prospect on behalf of the owners because the Investors felt that BT was not doing a competent job.

¶7. The Chandeleur Prospect was the subject of a federal diversity action in the United States District Court for the Southern District of Texas. That suit was filed by three of the Investors in the case *sub judice* (J.D. Mayfield, Roy Ward, and Malcolm Campbell) against BT and its principals Roger Evans and Campbell Evans. In that suit against BT, the operator of the Chandeleur Prospect, fraud was also alleged. The Investors never made a claim against Holland in the Texas case.

¶8. Also, BT had filed a lawsuit against the Investors and Holland in Louisiana state court. That case was removed to federal court by the Investors and then transferred to the Texas federal court where the two causes were consolidated. For the sake of brevity, we will refer to these two actions as simply the "Texas case." For a while, Holland was represented by the same attorneys as the Investors, and Chandeleur Limited paid for that representation.

¶9. Holland never appeared in the Texas case. Holland was dismissed from the Texas case sua sponte. On that same day, the federal court conducted a settlement hearing, at which the parties announced that they had agreed to settle the case. On February 8, 1993, the parties filed an Agreed Motion to Dismiss. On February 12, 1993, the court, through written order, dismissed the Texas case with prejudice.

¶10. The Investors filed this action against Holland on April 10, 1993. In April or May 1992, as a result of a deposition in the Texas case and an audit of the project, the Investors learned that the discrepancy in the price was the result of profits being paid on the front-end. Those profits amounted to approximately $800,

000. The front-end profit was split four ways between Roger Evans and Campbell Evans, who were BT principals, Robert Holland, and Bill Gaskin, a geophysicist. Holland received approximately $220,000 in front-end profit. Most of the Investors testified that had they known of the front-end profit they would not have invested in Chandeleur. A couple of Investors stated that they were unsure whether they would have still invested in the project if the front-end profit had been disclosed.

¶11. Holland testified that the information he gave the Investors came from Roger Evans with BT. Holland admitted that the representation that he had made to the Investors was false.

¶12. Holland filed a Motion to Dismiss the case *sub judice*, arguing that dismissal was warranted on the basis of the settlement agreement in the Texas case, res judicata, and certain statutes of limitation. The motion was denied. Holland later filed a Motion for Reconsideration of Defendant's Motion to Dismiss and Alternatively, to Amend Order to Grant Certification for Interlocutory Appeal. After hearing arguments on the Motion, the Chancellor denied the Motion and denied certification for an interlocutory appeal.

¶13. On November 27, 1995, Holland filed a Motion to Dismiss because of the alleged unauthorized practice of law by Lee Cline, a disbarred former Louisiana attorney who assisted the Investors' attorneys in this case. The court allowed discovery to be conducted on the unauthorized practice of law issue. After which the motion was denied.

¶14. At the conclusion of the trial, the Chancellor ruled from the bench that the Investors had proven a violation of the Mississippi Securities Act, Miss. Code Ann. §§ 75-71-101 et seq. (1991 & Supp. 1998). He concluded that Holland was not a party to, or released by the settlement agreement. Likewise, he found that the doctrine of res judicata would not apply to this case because Holland had been dismissed from the Texas case shortly before the settlement was reached. He also found that the Investors had proven fraud on the part of Holland, and then he awarded compensatory damages in the amount of $221,645.

¶15. The Investors presented punitive damages evidence by recalling Holland to the stand. The Chancellor, after considering Miss. Code Ann. § 11-1-65 (Supp. 1996), ruled that punitive damages were warranted and awarded the Investors $1,108,225 in punitive damages, five times the amount of compensatory damages. Thereafter, the Chancellor awarded the Investors attorneys' fees of $82,698.80. After post-trial motions were denied, Holland perfected his appeal to this Court.

## II.

¶16. The standard of review for factual determinations made by a trial judge sitting without a jury is the substantial evidence standard. ***Hill v. Thompson,*** 564 So. 2d 1, 10 (Miss. 1989); ***UHS-Qualicare, Inc. v. Gulf Coast Community Hosp., Inc.,*** 525 So. 2d 746, 753 (Miss. 1987). We will not disturb the findings of a chancellor when they are supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard. ***Herring Gas Co. v. Whiddon,*** 616 So. 2d 892, 894 (Miss. 1993).

## A.

## 1. Settlement Agreement

¶17. Holland claims that the lower court should have dismissed the Investors' action on the basis of the settlement agreement reached in the prior litigation or on the basis of res judicata due to the final judgment in

the prior litigation, or both. The complaint in the Texas case was filed by the Investors against BT, Campbell Evans, and Roger Evans on October 9, 1990. In November of 1990, BT, Campbell Evans, and Roger Evans sued the Investors and Holland in Louisiana state court. The Louisiana case was removed and transferred to the federal district court in Texas and consolidated with the Texas case.

¶18. Holland was dismissed from the Texas case sua sponte on January 6, 1993. On that same day, the Texas court conducted a settlement hearing in which the remaining parties announced that they had agreed to settle the case. The parties agreed to reduce the settlement to writing and to present it to the Court on January 7, 1993. It is unclear from the record whether Holland was dismissed before or after the settlement hearing. At any rate, on February 8, 1993, the remaining parties filed an Agreed Motion to Dismiss. On February 12, 1993, the court dismissed the Texas case with prejudice.

¶19. Holland contends on appeal that the Settlement Agreement settled all disputes between the parties concerning the Chandeleur Prospect, and that the trial court should have dismissed the Investors' suit against him.

¶20. The Investors argue that the Settlement Agreement in the Texas case has no bearing on the present case. They argue that Holland was joined as a third-party defendant by BT and that he never appeared in the Texas case. The Investors argue further that Holland was dismissed from the case and was not a party to the Settlement Agreement.

¶21. An examination of the Settlement Agreement shows that Holland's name appears in the style of the case as a third-party defendant. It then contains the following language: "Whereas the parties to such action have compromised and settled all disputes between them and now wish to memorialize their compromise and settlement by this Agreement." The Agreement goes on to say that, "[I]t is understood and agreed that this Settlement Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective representatives, successors, assigns, and each of its parents, affiliates, subsidiaries, successors in interest and each of their respective directors, officers, agents, servants, employees, and liability insurers." And finally, the Agreement states, "[I]t is understood and agreed that this Settlement Agreement contains the entire agreement between the parties and supersedes any and all prior agreements, arrangements, or understandings between the parties relating to the subject matter. No oral understandings, statements, promises or inducements contrary to the terms of this Settlement Agreement exist. This Settlement Agreement can not be changed or terminated orally." Holland did not sign the Settlement Agreement, nor is there a signature line designated for him.

¶22. On January 6, 1993, before the Settlement Agreement was actually executed, the federal court held a settlement hearing. The court questioned all parties present as to whether the agreement stated to the Court was in fact their agreement, and each responded that it was. Holland, however, was not present at the settlement hearing.

¶23. In interpreting any agreement the cardinal rule is to give effect to the intentions of the parties. *Holloman v. Holloman*, 691 So. 2d 897, 899 (Miss. 1996); *Century 21 Deep S. Properties, Ltd. v. Keys*, 652 So. 2d 707, 717 (Miss. 1995); *Newell v. Hinton*, 556 So. 2d 1037, 1042 (Miss. 1990) (holding that in interpreting a contract "the actual purpose and intent of the parties" must be derived); *Kight v. Sheppard Bldg. Supply, Inc.*, 537 So. 2d 1355, 1358 (Miss. 1989). The law in Mississippi is that "for a release of one joint tort-feasor to release other joint tort-feasors, the satisfaction received by the injured party must be intended to be and must be accepted as full and total compensation for damages sustained."

***Smith v. Falke,*** 474 So. 2d 1044, 1045 (Miss. 1985)(citations omitted). "[A]n injured party executing a release incident to a settlement with one tortfeasor releases others by whom or on whose behalf no considerations have been given only where the intent to release the others is manifest." ***Country Club of Jackson, Mississippi, Inc. v. Saucier,*** 498 So. 2d 337, 339-40 (Miss. 1986)(*citing **Smith v. Falke,*** 474 So. 2d 1044, 1046 (Miss. 1985); Restatement (2d) Torts, § 885(1) (1979)). Extrinsic evidence must be considered in determining whether a settlement agreement was intended to release a person who was not a party to the agreement. ***Smith***, 474 So. 2d at 1046.

¶24. We cannot say that the Investors' intent to release Holland was manifest. Here Holland was dismissed from the Texas action, *sua sponte*, prior to the settlement. Holland, who made no appearance in the Texas action, and who was represented jointly with the Investors here in the Louisiana action, was not involved in the case or in the settlement. Nor was Holland a signatory to the agreement. We conclude that the chancellor's finding that Holland was not a party to the Settlement Agreement, and therefore could not be the recipient of the benefits of the settlement, is not manifestly erroneous.

¶25. Holland also claims that he was BT's agent, and that as an agent, all claims against him were settled pursuant to the Settlement Agreement. The assertion, by the Investors, that Holland was an agent of BT was merely a means of assigning liability to BT, not to Holland. Even if Holland were an agent for BT, an agent who commits a tort is liable in both his representative capacity and in his individual capacity. ***American Fire Protection, Inc. v. Lewis***, 653 So. 2d 1387, 1391 (Miss. 1995). Nothing in the settlement agreement purports to release Holland in his individual capacity. This assignment of error is without merit.

## 2. Res Judicata

¶26. Next, Holland contends that any claims that the Investors have against him are barred by the doctrine of res judicata. Holland filed a Motion to Dismiss on the basis of res judicata on September 2, 1993. On November 16, 1994, the motion was denied by Chancellor Clark. On January 9, 1995, Holland filed a Motion for Reconsideration of Defendant's Motion to Dismiss and Alternatively, to Amend Order to Grant Certification for Interlocutory Appeal. After hearing arguments, Chancellor Dillard denied the Motion and denied certification for an interlocutory appeal. This Court denied Holland's Petition for Interlocutory Appeal on September 12, 1995.

¶27. In ***Aetna Cas. & Sur. Co. v. Berry,*** 669 So. 2d 56 (Miss. 1996), this Court stated that:

> The rule of law known as *res judicata* holds that when a court of competent jurisdiction enters a final judgment on the merits of an action, the parties or their privies are precluded from relitigating claims that were decided or could have been raised in that action. ***Walton v. Bourgeois,*** 512 So. 2d 698, 700 (Miss. 1987). There are four identities that must be present before a subsequent action may be dismissed on the grounds of *res judicata*:
>
> (1) identity of the subject matter of the original action when compared with the action now sought to be precluded; (2) identity of underlying facts and circumstances upon which a claim is asserted and relief sought in the two actions; (3) identity of the parties to the two actions, an identity met where a party to the one action was in privity with a party to the other; and (4) identity of the quality or character of a person against whom the claim is made.

> *Dunaway v. W.H. Hopper & Associates, Inc.,* 422 So. 2d 749, 751 (Miss. 1992).
>
> A party is precluded from raising a claim in a subsequent action if the four identities of *res judicata* are present. This is so regardless of whether all grounds for possible recovery were litigated or asserted in the prior action, so long as those grounds were available to a party and should have been asserted. *Dunaway,* at 751...

669 So. 2d at 67.

¶28. Nevertheless, the doctrine of res judicata only bars claims against parties who were adverse to each other in the original action. *Heller Fin., Inc. v. Grammco Computer Sales, Inc.*, 71 F.3d 518, 523 (5th Cir. 1996); *Burrell v. Southern Pac. Co.*, 474 P.2d 466, 468-69 (Ariz. Ct. App. 1970). Parties are adversaries only as to those claims actually asserted. *Jackson v. Lemler*, 83 Miss. 37, 42-44, 35 So. 306, 307-08 (1903); *Burrell*, 474 P.2d at 468-69; *Williams v. Evans*, 552 P.2d 876, 878, 879 (Kan. 1976); *Eyde v. Charter Township of Meridian*, 324 N.W.2d 775, 779 (Mich. Ct. App. 1982); *Krikava v. Webber*, 716 P.2d 916, 919 (Wash. 1986). Holland and the Investors were co-defendants in the prior action.

> Generally, co-defendants are not adversaries for the purposes of res judicata, even though a co-defendant could have filed a cross-claim against the other defendant:
>
> "A judgment ordinarily settles nothing as to the relative rights and liabilities of the co-plaintiffs or co-defendants *inter sese*, unless their hostile or conflicting claims were actually brought to issue, litigated and determined. 50 C.J.S., Judgments, § 819. See also Restatement of Judgments, § 82" *Cook v. Kendrick*, 16 Mich. App. 48, 51, 167 N. W. 2d 483 (1969).

*Eyde*, 324 N.W.2d at 779.

¶29. Here the investors filed no claims against Holland in the original action. Instead Holland was brought into the action as a third-party defendant by virtue of consolidation of the Louisiana action, where Holland and the investors were co-defendants, and the Texas action, where the investors were plaintiffs and Holland was brought in by impleader under Fed. R. Civ. P. 14. Rule 14 provides that an original plaintiff's claims against a third-party defendant are permissive, not mandatory. There is no automatic adversary relationship between an original plaintiff and a third-party defendant. Additionally, no cross-claim is compulsory. *Dunn v. Sears, Roebuck & Co.*, 645 F.2d 511, 512 n.1 (5th Cir. 1981); *Whittaker v. Schreiner*, 570 P.2d 299, 301 (Mont. 1977); *Executive Management, Ltd. v. Ticor Title Ins. Co.*, 963 P.2d 465, 474 (Nev. 1998). Thus, there was no adversary relationship between Holland and the Investors.

¶30. Additionally, the principles of res judicata are inconsistent with the idea of permissive claims; and therefore, res judicata does not operate to bar subsequent claims which may have been asserted but were not. *Krikava*, 716 P.2d at 918; *Eyde*, 324 N.W.2d at 779; *Burrell*, 474 P.2d at 470 (holding that res judicata did not preclude the subsequent filing of an action which was a permissive claim in a prior action). *See also Resolution Trust Corp. v. Farmer*, 836 F. Supp. 1123, 1132 (E.D. Pa. 1993) ("[A] party appearing in an action in one capacity, individual or representative, is not thereby bound by or entitled to the benefits of the rules of res judicata in a subsequent action in which he appears in another capacity."); *Lee v. Wiley Buntin Adjuster, Inc*., 204 So. 2d 479 (Miss. 1967) (where this Court reversed dismissal of a claim for fraud against an insurance adjuster based upon a settlement between the plaintiff and the insurer).

Therefore, the Chancellor did not err in denying Holland's Motion to Dismiss on the grounds of res judicata.

**B.**

¶31. Holland contends that Lee Cline, a disbarred Louisiana attorney, was engaged in the unauthorized practice of law on behalf of the Investors and that this case should have been dismissed based on his illegal activity. It is an uncontested fact that Cline was disbarred by the State of Louisiana on June 20, 1988, following a voluntary plea in a federal criminal proceeding. It is also uncontested that an Agreed Permanent Injunction was entered against Cline on November 3, 1992, by the Chancery Court of the Second Judicial District of Jones County, enjoining Cline from practicing law in the State of Mississippi. But the injunction stated, "...nothing herein shall preclude or prohibit Defendant from engaging in oil and gas land and operations management except to the extent such actions, if any, may constitute the unauthorized practice of law in this State."

¶32. Holland filed a Motion to Dismiss because of Unauthorized Practice of Law on November 27, 1995, alleging that Cline had been involved in every aspect of the case, including discovery, motions, and trial preparation. Specifically, Holland claims that Cline was present at depositions; made phone calls concerning the trial; prepared proposed exhibits for the trial; worked with the attorneys for the Investors; and arranged for a court reporter for the trial. The Investors stated that Cline was acting as the day-to-day operations officer in the transmittal of information from Chandeleur Ltd. to the attorneys.

¶33. Chancellor Dillard allowed discovery to be conducted on the unauthorized practice of law issue. This included taking the deposition of every Investor. Cline, however, asserted his Fifth Amendment privilege and refused to answer questions. The court refused to compel Cline to answer over his Fifth Amendment claim. A hearing on the matter was also held on March 12, 1996, at which the court ordered the production of certain documents. On June 4, 1996, Chancellor Dillard entered his Opinion and Order denying Holland's Motion to Dismiss. Holland filed a Motion for Reconsideration on June 19, 1997, which was also denied.

¶34. In his Opinion and Order, Chancellor Dillard stated:

> It is clear to this Court that Cline could be held in contempt for violation of the injunction issued by the Chancery Court of Jones County, Second Judicial District, by Chancellor J. Shannon Clark. It should be noted however, that is a separate chancery court proceeding, Cause No. 40,051. This judge was appointed by Chief Justice Armis Hawkins to serve as special chancellor in this cause only so, there is no authority to act in that matter. It is and that should be a separate proceeding. To compel the witness to answer the questions in this case would be a clear violation of his Fifth Amendment privilege. The motion to compel is therefore overruled and as a consequence, the motion to dismiss based on the unauthorized practice of law must likewise for the same reasons also be overruled.

¶35. Miss. Code Ann. § 73-3-55 (1995) outlaws the practice of law without a license. It provides, in pertinent part, that:

> It shall be unlawful for any person to engage in the practice of law in this state who has not been licensed according to the law. Any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and, upon conviction, shall be punished in accordance with the provisions of section 97-23-43. Any person who shall for fee or reward or promise, directly or indirectly, write or

dictate any paper or instrument of writing, to be filed in any cause or proceeding pending, or to be instituted in any court in this state, or give any counsel or advice therein, or who shall write or dictate any bill of sale, deed of conveyance, deed of trust, mortgage, contract, or last will and testament, or shall make or certify to any abstract of title or real estate other than his own or in which he may own an interest, shall be held to be engaged in the practice of law....

¶36. We conclude that Holland has presented insufficient evidence that Lee Cline was engaged in the unauthorized practice of law pursuant to Miss. Code Ann. § 73-3-55 (1995). The Chancellor did not err in denying Holland's Motion to Dismiss based on the unauthorized practice of law.

### C.

¶37. Holland argues that if the Court finds that the evidence presented on the unauthorized practice of law issue was insufficient, then it should require the Investors to fully respond to the document requests and various lines of deposition questioning that could produce relevant information on this issue. However, the Chancellor has already allowed Holland more than a sufficient amount of discovery on this issue. A large portion of the record in this case is devoted to just this issue. More discovery that "could produce relevant information" on this issue is not justified, especially in light of the lack of evidence Holland's initial discovery has produced. "The control of discovery is a matter committed to the sound discretion of the trial judge." *Broadhead v. Bonita Lakes Mall,* 702 So. 2d 92, 104 (Miss. 1997)(citing *Barnes v. A Confidential Party,* 628 So. 2d 283, 290 n.7 (Miss. 1993; *Dawkins v. Redd Pest Control Co.,* 607 So. 2d 1232, 1235 (Miss. 1992)). This assignment of error is without merit.

### D.

¶38. Holland next contends that the Investors' suit was barred by the statute of limitation. Miss. Code Ann. § 15-1-49 (1995) provides, in pertinent part that:

(1) All actions for which no other period of limitation is prescribed shall be commenced within three (3) years next after the cause of such action accrued, and not after.

Miss. Code Ann. § 15-1-67 (1995) provides, in pertinent part that:

If a person liable to any personal action shall fraudulently conceal the cause of action from the knowledge of the person entitled thereto, the cause of action shall be deemed to have first accrued at, and not before, the time at which such fraud shall be, or with reasonable diligence might have been, first known or discovered.

¶39. Holland contends that the Investors are barred because one of the Investors, Ward, testified that he had suspicions that there had been front-end profits paid as early as February of 1990 when he went to Houston to try and audit the books of BT. At that time, he discovered that a check for $32,000 had been written to a Laurel law firm. Holland also points to the testimony of another Investor, Ferguson, who testified that he may have known about Holland getting a front-end profit in 1990.

¶40. The record in this case contradicts Holland's assertions as to when the Investors discovered that Holland had received a front-end profit on the Chandeleur Prospect. First, in his testimony concerning the $32,000 check, Ward did not state that he knew that the check was paid on behalf of Holland. Ward went on to testify that he asked Holland the day of the discovery of the check if Holland knew of any reason that

that check would have been paid to a Laurel law firm, and Holland responded that he did not.

¶41. Further, a reading of Ferguson's testimony shows that he was unsure of when or from whom he received the information that Holland had received a front-end commission. It was only when he was pressed by Holland's attorney to give a specific year, that Ferguson reluctantly said, "1990". He then qualified his statement by testifying that, "a lot of things escape me now, and please understand that this is true. I just can't remember a lot of things after my open heart surgery."

¶42. These are the only two witnesses that Holland can point to to support his statute of limitation argument. The other Investors testified that they first discovered that front-end commissions had been paid to Holland, the Evanses, and Gaskin, from a deposition taken from one of the BT principals in the Texas case on January 2, 1992. The Investors' Complaint was filed on April 10, 1993, well within the statute of limitation. The Chancellor did not err in denying Holland's Motion to Dismiss based on Miss. Code Ann. §§ 15-1-49 and 15-1-67.

¶43. Holland also contends Miss. Code Ann. § 75-71-725 barred the Investors' cause of action. Section 75-71-725 provides the statute of limitation for securities fraud actions brought under Miss. Code Ann. § 75-71-717(a)(2) (1991), which was alleged by the Investors. Miss. Code Ann. § 75-71-725 (1991) provides, in pertinent part that:

> No action shall be maintained to enforce any liability created under section 75-71-717(2) unless brought within two (2) years after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence ....

¶44. Again, the evidence is overwhelmingly in favor of the Investors on this issue. They discovered Holland's untrue statement on January 2, 1992, and filed their Complaint on April 10, 1993, well within the statute of limitation. The Investors were not barred by either of these statutes of limitation. This assignment of error is wholly without merit, and the Chancellor did not err in denying Holland's Motion to Dismiss.

### E.

¶45. Holland contends that the Investors failed to prove the elements of fraud and that the Chancellor's decision should be reversed. "Fraud is never to be presumed or inferred, but must be proven by clear and convincing evidence." *Boling v. A-1 Detective & Patrol Serv., Inc.,* 659 So. 2d 586, 590 (Miss. 1995) (citing *Nichols v. Tri-State Brick and Tile, Inc.,* 608 So. 2d 324, 330 (Miss. 1992)). In order to establish fraud, the following elements must be proven: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that the representation should be acted upon by the hearer and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on the representation's truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury. *Allen v. Mac Tools, Inc.,* 671 So. 2d 636, 642 (Miss. 1996)(citing *Franklin v. Lovitt Equip. Co.,* 420 So. 2d 1370, 1373 (Miss. 1982)).

¶46. Holland clearly made a false representation. The Investors testified that Holland represented to them that he, Roger Evans, Campbell Evans, and Bill Gaskin would not receive any front-end profit on the acquisition of Chandeleur. He stated to them that he and the others would only receive a twenty-five percent reversionary interest after the Investors had made back all of their money. Holland represented that the Investors were buying the Chandeleur Prospect at BT's cost basis. These representations were proven

to be false at trial.

¶47. Holland's false representations were certainly material to the Investors' decisions to invest. Although a couple of Investors testified that they were not sure if they would have invested in Chandeleur if they had known of the front-end payments, most testified that they definitely would not have invested if they had known. Additionally, the Investors testified that because Holland represented that there was no front-end commission to be paid, the deal was more attractive.

¶48. Holland had knowledge that his representations were false. He admitted as much at trial. Although he maintained that he never received a front-end profit and that the Evanses and Gaskin did, Holland still made representations that he knew to be false.

¶49. Holland intended that the representations to be acted on in the manner reasonably contemplated. Holland was trying to induce the Investors to put their money in the Chandeleur Prospect. That was his job.

¶50. The Investors were clearly ignorant of the falsity of Holland's representation. There is no evidence to the contrary.

¶51. It is apparent from the Investors' testimony that they relied on Holland's false representations. Again, most of the investors testified that, had they known of the front-end profits before they invested, they would not have invested. Their reliance on the representation is clear because they were not aware of the front-end profits, and they did invest. The Investors also had the right to rely on Holland's false representations, as they were the parties he was doing business with.

¶52. Finally, Holland's false representations injured the Investors, in that they paid $221,645 more for Chandeleur than they would otherwise have paid. The Investors proved their claim sufficiently to allow the Chancellor, as fact finder, to conclude that there was clear and convincing evidence of fraud. This assignment of error is without merit.

**F.**

¶53. Holland also takes issue with the admission into evidence of a BT account ledger showing payments made by BT to and on behalf of Holland, and a letter confirming that the payments were made on behalf of Holland. As to the ledger, Holland argues that the document is a summary of other records which were not produced to Holland or introduced at trial. Therefore, Holland claims the document was inadmissible pursuant to Miss.R.Evid. 1006.

¶54. This document was admitted as an exhibit to Roger Evans's deposition. Holland objected on the basis that the document was a summary and that the Investors should produce the underlying documents supporting the summary. Specifically, Holland claimed that BT's books and the original checks should have been produced. The Investors responded that the document was a BT business record maintained in the ordinary course of business. Additionally, the Investors argued that the underlying documents were available to Holland at the time of the deposition and, therefore, under Miss. R. Evid. 1006, were available for his examination. The Chancellor overruled Holland's objection to the document, ruling that it was a business record kept in the ordinary course of business, and therefore admissible.

¶55. Miss.R.Evid. 1006 provides:

The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The court may order that they be produced in court.

¶56. The Investors stated that the underlying documents supporting the objectionable document were available for Holland's examination at the deposition of Roger Evans. Holland did not refute this statement at trial, nor does he do so in his brief. The conclusion to be drawn then, is that the underlying documents were indeed available to Holland. Under Rule 1006, this document was admissible, and the Chancellor did not err in admitting it.

¶57. Holland also complains that the Chancellor erred in admitting into evidence a letter, which is not in the record or the record excerpts, purporting to confirm that at the request of Holland, BT paid a Laurel law firm on Holland's behalf. It also purports to say that the money paid to the firm was deducted from monies that Holland was to receive on the sale of Chandeleur to the Investors.

¶58. Holland's complains that the letter was not properly authenticated and was hearsay. We must agree. The witness who was allowed to testify as to the contents of the letter was neither the sender nor the recipient of the letter. This letter was clearly hearsay and should not have been admitted. However, the admission of the letter was cumulative and not reversible error. Other evidence in the record showed that Holland's legal bills had been paid by BT, including Holland's own testimony and the above-referenced account ledger. This assignment of error is without merit.

## G.

¶59. Holland argues that the award of punitive damages and attorney fees should be reversed. Miss. Code Ann. § 11-1-65 (Supp. 1998) provides in pertinent part that:

(1) In any action in which punitive damages are sought:

(a) Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought ... committed actual fraud.

. . . .

(e) In all cases involving an award of punitive damages, the fact finder, in determining the amount of punitive damages, shall consider, to the extent relevant, the following: the defendant's financial condition and net worth; the nature and reprehensibility of the defendant's wrongdoing, for example, the impact of the defendant's conduct on the plaintiff, or the relationship of the defendant to the plaintiff; the defendant's awareness of the amount of harm being caused and the defendant's motivation in causing such harm; the duration of the defendant's misconduct and whether the defendant attempted to conceal such misconduct; and any other circumstances shown by the evidence that bear on determining a proper amount of punitive damages ....

. . . .

¶60. As discussed previously, the Investors clearly and convincingly proved that Holland acted fraudulently. In the punitive phase the Investors recalled Holland to the stand. His testimony was the only evidence

presented by the Investors in support of the punitive award.

¶61. The Chancellor made his ruling from the bench after stating the elements to be considered under Miss. Code Ann. § 11-1-65 (Supp. 1998). He ruled that:

> So the Court then, considering those elements, does find that the defendant does have some properties of value. And in particular, the 6.25 interest still in Block 16 and the interest apparently that is still owned in Block 18 and a farm in Ovett, Mississippi and interest of the value of approximately $400,000 in Colorado and that his income from the past year was roughly $100,000 as I understood his testimony. But nevertheless, the Court is of the opinion that punitive damages should be awarded in this cause, and the Mississippi Supreme Court and other courts have held that an award of five times the actual damages as punitive damages is not excessive. And therefore, the Court imposes punitive damages in the amount of $1,108,225.

It can not be said that the Chancellor abused his discretion in determining that punitive damages were appropriate in this case.

¶62. Holland also argues that attorneys' fees are only appropriate in cases where punitive damages are appropriate, and because punitives were not warranted in this case neither were attorneys' fees. The record in this case supports the award of punitive damages, and therefore, the award of attorneys' fees was appropriate.

## CONCLUSION

¶63. For the above and foregoing reasons, the judgment of the chancery court is affirmed.

¶64. **THE JUDGMENT OF THE CHANCERY COURT IS AFFIRMED. FURTHER, PURSUANT TO MISS. CODE ANN. § 11-3-23 (1991), WE RENDER JUDGMENT AGAINST ROBERT M. HOLLAND, JR., AND IN FAVOR OF THE INVESTORS, FOR DAMAGES AT THE RATE OF FIFTEEN PERCENT OF THE TOTAL DAMAGES AWARDED BY THE JUDGMENT BELOW.**

**PRATHER, C.J., SULLIVAN, P.J., McRAE AND COBB, JJ., CONCUR. PITTMAN, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH AND MILLS, JJ. WALLER, J., NOT PARTICIPATING.**

**PITTMAN, PRESIDING JUSTICE, DISSENTING:**

¶65. I respectfully dissent because, in my view, the majority's opinion erroneously concludes that Holland was not an agent of BT.

¶66. An examination of the Settlement Agreement shows that Holland's name appears in the style of the case as a third-party defendant. The Agreement contains the following language: "Whereas the parties to

such action have compromised and settled all disputes between them and now wish to memorialize their compromise and settlement by this Agreement." The Agreement goes on to say that, "[I]t is understood and agreed that this Settlement Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective representatives, successors, assigns, and each of its parents, affiliates, subsidiaries, successors in interest and each of their respective directors, officers, agents, servants, employees, and liability insurers." And finally, the Agreement states, "[I]t is understood and agreed that this Settlement Agreement contains the entire agreement between the parties and supersedes any and all prior agreements, arrangements, or understandings between the parties relating to the subject matter. No oral understandings, statements, promises or inducements contrary to the terms of this Settlement Agreement exist. This Settlement Agreement can not be changed or terminated orally." Holland did not sign the Settlement Agreement, nor is there a signature line designated for him.

¶67. At first glance, it appears that Holland was not a party to the Settlement Agreement and therefore could not be the recipient of the benefits of the settlement. The law in Mississippi is that "for a release of one joint tort-feasor to release other joint tort-feasors, the satisfaction received by the injured party must be intended to be and must be accepted as full and total compensation for damages sustained." *Smith v. Falke,* 474 So. 2d 1044, 1045 (Miss. 1985)(citations omitted). "[A]n injured party executing a release incident to a settlement with one tortfeasor releases others by whom or on whose behalf no considerations have been given only where the intent to release the others is manifest." *Country Club of Jackson, Mississippi, Inc. v. Saucier,* 498 So.2d 337, 339-40 (Miss. 1986)(*citing Smith v. Falke,* 474 So.2d 1044, 1046 (Miss., 1985); Restatement (2d) Torts, § 885(1) (1979)).

¶68. It does appear that Holland was BT's agent, and that as an agent, all claims against him were settled pursuant to the Settlement Agreement. The Investors concede that they have argued throughout this case that Holland was BT's agent, but argue that when Holland was asked in the Investors' Request for Admissions whether he was BT's agent, he answered "No."

¶69. In *First Jackson Securities Corp. v. B.F. Goodrich Co.,* 253 Miss. 519, 176 So.2d 272 (1965), this Court held that:

> An agent is one who acts for or in the place of another by authority from him; one who undertakes to transact some business or manage some affairs for another by authority and on account of the latter, and to render an account of it. He is a substitute, a deputy, appointed by the principal, with power to do the things which the principal may or can do.
>
> The most characteristic feature of an agent's employment, is that he is employed primarily to bring about business relations between his principal and third persons, and this power is perhaps the most distinctive mark of the agent as contrasted with others, not agents, who act in representative capacities.

253 Miss. at 532-33, 176 So.2d at 278 (*quoting* 2 C.J.S. *Agency* § 1c, at 1024 (1936)). Accord, *Emil v. The Mississippi Bar,* 690 So.2d 301, 317 (Miss. 1997).

¶70. My view, based on *First Jackson Securities Corp.,* is that Holland was BT's agent. According to Holland, his job with BT was to market oil and gas properties to potential investors. Holland brought about the business relations between BT, his principal, and the Investors, the third party. Holland was BT's agent.

¶71. The Settlement Agreement clearly and unambiguously states that:

> **It is understood and agreed that this Settlement Agreement shall be binding upon and inure to the benefit of the parties hereto and their** respective representatives, successors, assigns, and each of its parents, affiliates, subsidiaries, successors in interest and each of their respective directors, officers, **agents**, servants, employees, and liability insurers.

(emphasis added).

¶72. Holland was BT's agent, as the Investors have argued throughout this proceeding, and, as such, he is a recipient of the benefits of the Settlement Agreement. Holland's Motion to Dismiss should have been granted. Therefore, I would reverse and render.

**SMITH AND MILLS, JJ., JOIN THIS OPINION.**