556 So.2d 1037 (1990)
Tammie NEWELL (Hinton)
v.
Mark T. HINTON.
No. 89-CA-0092.
Supreme Court of Mississippi.
January 31, 1990.
*1039 Jack Parsons, Rebecca Cartledge Taylor, Parsons & Matthews, Wiggins, for appellant.
Gregory L. Gore, Hattiesburg, for appellee.
Before HAWKINS, P.J., and ANDERSON and BLASS JJ.
ANDERSON, Justice, for the Court:

STATEMENT OF THE CASE
This is an appeal from the judgment of the Chancery Court of Perry County. The appellant was found in contempt of the Final Judgment for Divorce and ordered to pay the sum of $2,160.00 to the appellee. In addition, the appellant was ordered to be confined to jail until she purged herself of the contempt; however the chancellor suspended the execution of the order of incarceration for sixty days to allow the appellant a reasonable time to purge herself of the contempt.

STATEMENT OF THE FACTS
Mark T. Hinton [hereinafter Hinton] and Tammie Newell Hinton [hereinafter Newell] were married on July 24, 1981. The couple owned two vehicles, a 1984 Ford Mustang and a 1981 Ford Pick-up truck, when, on June 28, 1985, they traded in their 1984 Mustang and executed a lease purchase agreement with Treadwell Ford for a 1985 Ford Mustang. Treadwell assigned this contract to Ford Motor Credit Corporation [hereinafter Ford]. This agreement provided, in part, that the lease was for a 48 month term beginning July 25, 1985.
On July 24, 1985, the parties separated. They executed their property settlement agreement on August 12, 1985. They filed their complaint for divorce, based on irreconcilable differences, on August 16, 1985. *1040 This agreement was made a part of the Final Judgment for Divorce granted on October 28, 1985. It provided in part: "Husband will receive one 1981 Ford pickup truck ... [and he] will pay any indebtedness due and owing on the above items." Wife shall receive "... the 1984 Ford Mustang [and she] will be responsible for all indebtedness due and owing on the above items."
On April 2, 1987, the parties were in default and Ford repossessed the car, and it was sold at a private sale on April 16, 1987. As a result of the repossession and subsequent sale, on April 27, 1988, Ford filed a complaint in the County Court of Forrest County for the deficiency in the amount of $3,972.96. Mr. Hinton was served with this complaint for deficiency and attorney fees on May 2, 1988.
On May 31, 1988, Hinton filed a Complaint For Contempt in the Chancery Court of Perry County alleging that Newell failed to abide by the Judgment of Divorce. In response Newell filed her Answer to the Complaint for Contempt denying Hinton's allegations on July 21, 1988. The parties then filed their memoranda in support of their contentions. On November 2, 1988, Hinton filed a Motion for Summary Judgment to which Newell filed an answer on December 5, 1988. The motion was granted by the court on December 14, and the chancellor ordered Newell be confined to the Perry County Jail until she paid the amount owed, but he suspended the order of incarceration for sixty days to allow Newell a reasonable time in which to purge herself of the contempt. On December 27, 1988, Newell filed her Motion for Reconsideration, and timely filed her Notice of Appeal on January 12, 1989.

PROPOSITION I

THE LOWER COURT ERRED IN GRANTING MOTION FOR SUMMARY JUDGMENT WHEN GENUINE ISSUES OF MATERIAL FACT EXISTED
The dispute between these parties focuses on the property settlement agreement. In part the Agreement, executed on August 12, 1985, and made a part of the Final Judgment of Divorce of October 28, 1985, provides:
1. DIVISION OF REAL PROPERTY:
The parties hereto agree that all real property owned by them in their individual names shall remain their individual property. That Husband shall receive the five (5) Quarter horses owned by the parties and Wife will sign her interest in the same unto Husband. Husband will receive one 1981 Ford pickup truck (1) 1979 WW horse trailer and all his personal belongings and said Husband will pay indebtedness due and owing on the above items. Wife shall receive the Glenbrook house trailer, the 1984 Ford Mustang, all the furnishings in the Glenbrook house trailer, all her personal belongings and said Wife will be responsible for all indebtedness and owing on the above items.

3. VOLUNTARY EXECUTION:
The provisions of this agreement and their legal effects have been fully explained to the parties, and each party acknowledged that this agreement is fair and equitable and that it is being entered into voluntarily, and that it is not the result of any duress or undue influence.
4. ENTIRE AGREEMENT:
This agreement contains the entire understanding of the parties, and there are no representation[s], warranties, covenants, or other undertakings other than those expressly set forth herein.

(Emphasis added).
In his Motion for Summary Judgment, Hinton provided to the chancellor his sworn affidavit explaining the sequence of events leading up to his filing his motion for contempt against his ex-wife. He explained that he and Newell owned two vehicles, a 1984 Ford Mustang and a 1981 Ford pickup, but they later traded in the car and executed a lease agreement for a 1985 Ford Mustang.
Also included with his motion were the following:
(a) A copy of Treadwell Ford invoice no. 3537 dated June 28, 1985 evidencing the lease purchase of the 1985 Ford Mustang. *1041 In addition the invoice shows that the 1984 Ford Mustang was used as a trade-in;
(b) A copy of an Odometer Mileage Statement of the 1984 Mustang signed by Hinton and Newell as transferors to Treadwell Ford as transferees. Dated June 28, 1985;
(c) A copy of a draft from Treadwell Ford to First Mississippi National Bank, lienholder on the 1984 Ford. Dated July 8, 1985; and
(d) A copy of Retail Lease Record of Ford Motor Credit Company regarding the 1985 Mustang.
Hinton also provided documents to provide evidence of Newell's default. These included a copy of a notice of private sale from Ford; a copy of the complaint for deficiency by Ford filed against Hinton and Newell; and a copy of Request for Admissions With Accompanying Interrogatories from Ford's attorney to Hinton's attorney. In particular the complaint from Ford alleged that the 1985 Ford Mustang had been purchased on July 28, 1985 and because of default the car was repossessed on April 2, 1987 and sold on April 16. The sale resulted in a deficiency of $3,972.96 for which Ford was suing the defendants along with costs and attorney fees.
Hinton provided more information. He gave the chancellor a copy of a Release of Claims, along with a copy of his cashier's check in the amount of $1,500 used to settle the claim with Ford. In addition, Hinton presented to the chancellor an agreed order of dismissal with prejudice drafted by his attorney which was mailed with the payment along with the release form to Ford's attorney.

DISCUSSION OF LAW
In determining whether the trial court was proper in granting Hinton's Motion for Summary Judgment, we must conduct de novo review. Allison v. State Farm Fire & Casualty Co., 543 So.2d 661, 663 (Miss. 1989); Clark v. Moore Memorial United Methodist Church, 538 So.2d 760, 762 (Miss. 1989).
The law governing the grant or denial of a motion for summary judgment is well established. Fruchter v. Lynch Oil Co., 522 So.2d 195, 198 (Miss. 1988). This Court has explained repeatedly:
The trial court must review carefully all of the evidentiary matters before it  admissions in pleadings, answers to interrogatories, depositions, affidavits, etc. The evidence must be viewed in the light most favorable to the party against whom the motion has been made. If in this view the moving party is entitled to judgment as a matter of law, summary judgment should forthwith be entered in his favor. Otherwise the motion should be denied.
Issues of facts sufficient to require denial of a motion for summary judgment obviously are present where one party swears to one version of the matter in issue and another says the opposite.
Dennis v. Searle, 457 So.2d 941, 944 (Miss. 1984). See also, Allison, 543 So.2d at 663; Moore Memorial, 538 So.2d at 762; Short v. Columbus Rubber & Gasket Co., 535 So.2d 61, 63 (Miss. 1988); and Brown v. Credit Center, Inc., 444 So.2d 358 (Miss. 1983).
The movant is strapped with the burden of demonstrating that no genuine issue of fact exists while the non-movant is given the benefit of every reasonable doubt. Smith v. Sanders, 485 So.2d 1051, 1054 (Miss. 1986). By the same token, however, the non-movant cannot just sit back and remain silent, but he must rebut by producing significant probative evidence showing that there are indeed genuine issues for trial. Fruchter, 522 So.2d at 198-99; Smith v. First Federal Savings & Loan Association, 460 So.2d 786, 792 (Miss. 1984). The non-movant, in generating an issue of fact sufficient to avoid an adverse rendering of summary judgment, cannot rely solely on his pleadings, which simply allege or deny a material fact. Sanders, 485 So.2d at 1054. See also, Hill v. Consumer National Bank, 482 So.2d 1124, 1128 (Miss. 1986) cited in Fruchter, 522 So.2d at 198-99. But, he must present "by affidavit or otherwise set forth specific *1042 facts showing that there are indeed genuine issues for trial." Fruchter, 522 So.2d at 199; see also, First Federal, 460 So.2d at 792. Stated another way, the non-movant must bring forward "significant probative evidence demonstrating the existence of a triable issue of fact." Union Planters National Leasing, Inc. v. Woods, 687 F.2d 117, 119 (5th Cir.1982) (emphasis added) reh'g denied, 691 F.2d 502 (5th Cir.1982); see also, Brown, 444 So.2d 358.
Now that the course to summary judgment has been charted, we must turn to the evidence to see if there is a genuine issue of material fact.
Newell asserts that the property settlement agreement itself has created that genuine issue because "Hinton contends the property settlement agreement does not mean what it says." More particularly Newell maintains that the agreement holds her responsible for a 1984 Mustang. Hinton, on the other hand, maintains that this is no more than a "scribner's [sic] error" because it is obvious that the parties' agreement referred to the Mustang. In any event, it seems clear that this is a question related to contracts.
In Roberts v. Roberts, 381 So.2d 1333, 1335 (Miss. 1980), this Court stated:
The rules applicable to the construction of written contracts in general are to be applied in construing a post nuptial agreement. Such a contract must be considered as a whole, and from such examination the intent of the parties must be gathered. Such construction should be given the agreement, if possible, as will render all its clauses harmonious, so as to carry into effect the actual purpose and intent of the parties as derived therefrom.
Intent of the parties is crucial in contract interpretation. See Sumter Lumber Co. v. Skipper, 183 Miss. 595, 184 So. 296 (1938) cited in Estate of Hensley v. Estate of Hensley, 524 So.2d 325, 327 (Miss. 1988). Of course it must be understood that the words employed in a contract are "by far the best resource for ascertaining intent and assigning meaning with fairness and accuracy." Skipper, 183 Miss. at 608, 184 So. at 298; see also, Hensley, 524 So.2d at 327. However, where the court understands from the written contract the obvious intentions of the parties, it may strike an improper word or clerical error or include an inadvertent omission so long as the court understands what words should have been used. Robinson v. Martel Enterprises, Inc., 337 So.2d 698, 701 (Miss. 1976); see also, McCain v. Cox, 531 F. Supp. 771, 781 (N.D.Miss. 1982), aff'd, 692 F.2d 755 (5th Cir.1982).
There is no question that Hinton and Newell traded their 1984 Ford Mustang for a 1985 Ford Mustang on June 28, 1985. As a matter of fact, they agree that they did. Therefore, on July 24, 1985, when the parties separated, neither owned the 1984 Ford Mustang nor did they owe any money for the 1984 Ford. Moreover, they did not own that car when they executed their property settlement agreement on August 12, 1985. By the time the court incorporated the property settlement into the judgment on October 28, 1985, it had been four months since the former couple had traded-in the 1984 Mustang.
On the other hand, however, when the judgment was executed, there remained some forty-four monthly payments for the 1985 Mustang. Indeed if the parties were contracting the obligations concerning the 1984 Mustang, then they would have failed completely to address the payments of the new car. If they had failed to address this concern, then the obvious question would be: who would be responsible for paying the notes on the 1985 Mustang? Consequently, it is obvious the parties were not referring to the 1984 Mustang when they drafted and executed the property settlement agreement.
Furthermore, the intention of the parties is reflected by the subsequent conduct of the parties. They agreed to allow Newell to keep the house and car while Hinton retained the truck and the horses. While reasonably relying on the property settlement agreement, Hinton made no payments on the Mustang. Subsequently, the car was repossessed because the payments were not made.
*1043 Hinton has provided a plethora of evidence, and it appears that the chancellor was wise to grant the summary judgment; however, before coming to that conclusion, we must examine the evidence that Newell presented on her behalf. Cunningham v. Lanier, 555 So.2d 685 (Miss. 1989). As the non-movant she has to bring forward "significant probative evidence demonstrating the existence of a triable issue of fact." Union Planters, 687 F.2d at 119 (emphasis added).
First of all Newell concedes that the parties did trade in their 1984 Mustang for a 1985 Mustang. In addition, it is undisputed that she retained exclusive use and possession of the new car after August, 1985 until she "let the car go." Moreover, she recognizes that both parties were sued for the deficiency and that Hinton has paid $1,500.00 in settlement of the lawsuit while she paid the amount necessary to be released from the indebtedness.
Newell maintains, however, that she and Hinton reached an agreement as to the division of property and delegation of debts, that they spoke with their attorney and provided him with lists for his use in drawing up the property settlement agreement, and that they did this prior to the time they traded the 1984 Mustang. Newell further claims that she never agreed to be solely responsible for the lease on the new car and that Hinton agreed to help her with the lease. Because Hinton did not assist her, Newell had to let the car go back to Ford because she could not handle the payments alone. Newell's defense can be summed up in one sentence: "I only agreed to be responsible for the payments on the 1984 Mustang, not the 1985 Mustang." With this in mind the focus once again is turned to the 1985 Mustang.
These allegations in this one affidavit merely rise to the level of factual disputes which are insufficient to justify denial of a summary judgment motion particularly when examining the evidence that Hinton presented to the court. Simons v. City of Columbus, 593 F. Supp. 876, 880 (N.D.Miss. 1984), aff'd, 805 F.2d 1031 (5th Cir.1984); see also, Briscoe's Foodland Inc., v. Capital Associates, Inc., 502 So.2d 619, 623 (Miss. 1986). The property settlement agreement has become a part of the final divorce decree for all legal intents and purposes. Switzer v. Switzer, 460 So.2d 843, 844 (Miss. 1984). When ambiguities, such as the one involved in this case, are discovered the agreement should be construed "much as is done in the case of a contract, with the court seeking to gather the intent of the parties and render its clauses [words or numbers] harmonious in light of that intent." Id. It could not have been the intent of the parties to enter a contract involving a car they no longer owned.
In a related matter, Newell alleges that the chancellor improperly awarded attorneys fees to Hinton. During this hearing, however, Hinton covered all bases. Included with copies of all the documents concerning the purchase of the 1985 Mustang, Hinton also provided the chancellor with a copy of a statement of his attorneys fees he sustained in defense of the deficiency claim and in the prosecution for contempt of the divorce decree against Newell. Just as he had done in presenting the evidence regarding Newell's default, Hinton went one step further by providing to the chancellor an affidavit of a local attorney attesting to the fact that his attorneys fees were indeed reasonable.
An award of attorney's fees in a contempt case is proper. Stauffer v. Stauffer, 379 So.2d 922, 924 (Miss. 1980), and the award of fees is largely entrusted to the sound discretion of the chancellor. Cheatham v. Cheatham, 537 So.2d 435, 440 (1988). However, there is a limitation as outlined in McKee v. McKee:
In determining an appropriate amount of attorneys fees, a sum sufficient to secure one competent attorney is the criterion by which we are directed. The fee depends on consideration of, in addition to the relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the *1044 cause, the time and labor required, the usual and customary charge in the community, and the preclusion of employment by the attorney due to the acceptance of the case.
418 So.2d 764, 767 (Miss. 1982) (citations omitted); see also, Smith v. Smith, 545 So.2d 725, 728 (Miss. 1989).
We must conclude that the chancellor correctly granted summary judgment for Hinton, and properly awarded attorneys' fees to Hinton.

PROPOSITION II

THE LOWER COURT ERRED IN FINDING THE DEFENDANT/APPELLEE TAMMIE NEWELL (HINTON) IN CONTEMPT WITH NO CONSIDERATION OF HER ABILITY TO PERFORM ITS DECREE
In Hinton's Complaint to find Newell in contempt he asked the court for the following relief:
(a) require [Newell] to show cause why she should not be held in contempt;
(b) order [Newell] to abide by the court's order and pay the indebtedness secured by the Ford mustang;
(c) order [Newell] to reimburse him for reasonable attorneys fees incurred in the prosecution of this matter;
(d) find [Newell] in contempt and order her to be confined in jail until she purges herself of the contempt; and
(e) such other relief to which he may be entitled.

DISCUSSION OF LAW
This case represents a civil contempt which has been defined as follows:
If the purpose of the proceedings is to coerce action or non-action by a party, the order of contempt is characterized as civil. This type contempt proceeding is ordinarily instituted by one of the parties to the litigation who seeks to coerce another party to perform or cease performing an act. The order of contempt is entered by the court for the private benefit of the offended party. Such orders, although imposing a jail sentence, classically provide for termination of the contemnor's sentence upon purging himself of the contempt. The sentence is usually indefinite and not for fixed term. Consequently, it is said that the contemnor `carries the key to his cell in his own pocket.' [citations omitted]
Jones v. Hargrove, 516 So.2d 1354, 1357 (Miss. 1987). See also, Hinds County Bd. of Supervisors v. Common Cause, 551 So.2d 107, 120-21 (Miss. 1989); Smith, 545 So.2d at 727.
Even when there has been established a prima facie case of contempt, the defendant may avoid judgment of contempt by establishing that he is without present ability to discharge his obligation. Smith, supra at 727; see also, Prestwood v. Hambrick, 308 So.2d 82, 85 (Miss. 1975). If the contemnor raises this as a defense, he has the burden of proving his inability to pay, and such showing must be made with particularity and not in general terms. Clements v. Young, 481 So.2d 263, 271 (Miss. 1985) cited in Jones, 516 So.2d at 1357.
There are other defenses as well. For example, the defendant may show that he was not guilty of wilful or deliberate violation of the prior judgment or a decree. Dunaway v. Busbin, 498 So.2d 1218, 1222 (Miss. 1986) (emphasis added); Hooker v. Hooker, 205 So.2d 276, 278 (Miss. 1967). The burden of the defendant in raising this defense, however, is not nearly as great as the defendant who claims he is without ability to pay. Consequently, it is appropriate that this defense be viewed against the "extremely lenient view this Court and the courts of this state have taken of contempt proceedings in general." Smith, 545 So.2d at 727. Furthermore, a contemnor also has available to him the traditional notion of "clean hands" as a defense. Vockroth v. Vockroth, 200 So.2d 459, 463 (Miss. 1967) cited in Smith, supra. Vagueness or the lack of specificity of the decree gives the contemnor another avenue for defense as well. Id.
Even if the defendant cannot successfully raise a defense, the court's *1045 power to commit a person to jail until he complies with the terms of a decree depends upon his present ability to pay. Wilborn v. Wilborn, 258 So.2d 804, 805 (Miss. 1972) quoted in Jones, 516 So.2d at 1357. If the person has already been committed to jail, he is entitled to be discharged on proof of inability to pay. Id. at 1358. This contrasts with criminal contempt in that the purpose of incarceration is punitive and the contemnor is jailed regardless of an offer of payment or a present inability to make payment. Id.; see also 27C C.J.S. Divorce § 715 (1986).
In the case sub judice, although the chancellor may have been correct in granting summary judgment on the issue of contempt, he should have given Newell a meaningful opportunity to present her defense as to payment of the attorneys' fees. There should have been a careful examination of her present ability to pay. It does not matter that the chancellor suspended his order of incarceration for sixty days giving Newell the time to satisfy the judgment. If she had failed to pay the amount within this time period, according to the chancellor, she would go to jail. And, she would remain in jail until she purged herself of the contempt. This was wrong.
This Court is fully aware of the constitutional problems implicated in the chancellor's ruling. If for some reason Newell is unable to come up with the amount owed during her life time would that also mean imprisonment for life? This may well be the case. Ex Parte Raymer, 644 S.W.2d 889, 890 (Tex. App. 1982); Jones, 516 So.2d at 1358.
In the case of Brown v. Brown, (1933), 205 Ind. 664, 187 N.E. 836 [the Supreme Court of Indiana] stated that when one has been imprisoned for failure to comply with an order ... and where [the] defendant is able to show that he has not the actual ability to pay for any one of a number of valid reasons, then [the] defendant is entitled to be discharged. The Court went on to hold that a defendant cannot be imprisoned indefinitely because of failure to pay support money where it is shown that he does not have an ability to make such payments and cites such a practice as being unconstitutional on the grounds of cruel and unusual punishment.
Smith v. Indiana State Board of Health, 158 Ind. App. 445, 303 N.E.2d 50, 60 (1973) quoted in Jones, 516 So.2d at 1358. "The result of [Newell's] inability to pay may well be an unfortunate one, and this Court appreciates the frustration possibly experienced by the trial judge, but the fact remains that one cannot be imprisoned where the failure to pay is due to an inability to comply." Jones, 516 So.2d at 1358; see also, Murphy v. Murphy, 447 So.2d 798, 800 (Ala. Civ. App. 1984).
Therefore, we must remand this case so that the chancellor can determine if Newell has the ability to reimburse Hinton as well as pay his attorneys fees in defending this case. In addition, Newell is taxed with the costs of this appeal.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN and BLASS, JJ., concur.