907 So.2d 362 (2004)
Rhett R. RUSSELL, Appellant
v.
J. Stewart WILLIFORD, M.D., D.G. Kobs, M.D., and Reikes Hale Kobs & Strauss Radiologists, a Partnership, Appellees.
No. 2003-CA-01573-COA.
Court of Appeals of Mississippi.
November 30, 2004.
Rehearing Denied May 3, 2005.
Certiorari Denied July 21, 2005.
Frank A. Russell, George E. Dent, Tupelo, attorneys for appellant.
Dorrance Aultman, Hattiesburg, J. Robert Ramsay, Matthew D. Miller, Gulfport, Chadwick L. Shook, Hattiesburg, attorneys for appellees.
EN BANC.
MYERS, J., for the Court.
¶ 1. On May 28, 2002, Russell filed his complaint against J. Stewart Williford, M.D., D.G. Kobs, M.D., and Reikes Hale Kobs & Strauss Radiologists, a Partnership ("the doctors"), alleging medical malpractice. The doctors filed motions to dismiss, arguing that the action was barred by the statute of limitations. The court, in considering the motions to dismiss, considered *363 some material outside of the pleadings, and the motions to dismiss were thus transformed into motions for summary judgment. The court granted the doctors' motions orally on June 12, 2003 and entered its written order on June 23, 2003, thereby dismissing Russell's action with prejudice. Aggrieved by this ruling, Russell now appeals.
¶ 2. Russell raises the following issues, which, for clarity and convenience, we have combined and recast from their original wording in his brief:
I. DID THE TRIAL COURT ERR IN FINDING THAT THE APPELLANT FAILED TO EXERCISE DUE DILIGENCE?
II. DID THE TRIAL COURT ERR IN APPLYING THE 1998 VERSION OF THE STATUTE OF LIMITATIONS FOR MEDICAL MALPRACTICE?
III. DID THE TRIAL COURT ERR IN FAILING TO CONSIDER THE AFFIDAVITS PRESENTED IN OPPOSITION TO THE APPELLEES' MOTIONS TO DISMISS?
¶ 3. Finding no reversible error, we affirm the judgment of the circuit court.

FACTS
¶ 4. On July 31, 1973, Russell had surgery on his left leg in order to correct injuries he suffered in an automobile accident. Immediately after the surgery, Russell noticed that his left leg was turned out toward the left in an abnormal way. Because of this abnormal turning in his left leg, Russell consulted Dr. Williford in order to determine the nature of the problem, if any. Dr. Williford concluded that there was a muscular problem brought on by the nature of the incisions he had to make in performing the surgery. Dr. Williford advised Russell that the problem could be corrected through physical therapy.
¶ 5. Although Russell learned to force his left leg to face forward, the physical therapy did not completely correct the problem, and for many years thereafter, Russell lived with this condition in his left leg. The condition was most noticeable when Russell was exhausted or fatigued, because at those times he had to make a more conscious effort to keep his leg from turning. Russell's pleadings and testimony were not entirely consistent on the question of pain in his left leg after surgery. The complaint alleges that Russell experienced severe pain periodically to his left knee, and his testimony indicates that he would experience pain when a cold front or rain would pass through. However, his testimony and his affidavit filed in opposition to the motions to dismiss allege that he felt no pain in his left knee until June 2000. Thus, Russell's pleadings and testimony on the question of pain in his left leg are contradictory.
¶ 6. Twenty-seven years after the surgery, Russell again sought the advice of a doctor on the subject of his left leg. In June 2000, Dr. Clyde Phillips informed Russell that his femur was misaligned and that this misalignment of the femur was responsible for the problems with his left leg. Russell received some corrective surgery, and, having incurred this expense and facing the possibility of additional expense through further corrective surgery, Russell brought this action.

LEGAL ANALYSIS

I. DID THE TRIAL COURT ERR IN FINDING THAT THE APPELLANT FAILED TO EXERCISE DUE DILIGENCE?
¶ 7. Russell argues that the trial court improperly invaded the province of the *364 jury by making a factual determination on the issue of due diligence. He argues that the case law of Mississippi holds that the presence or absence of due diligence is a fact issue to be decided by the jury. The doctors argue that the application of statutes of limitations is a question of law to be decided by the trial judge, and that in any event, the undisputed facts demonstrated that Russell failed to exercise due diligence for purposes of determining accrual under the applicable statute of limitations.

STANDARD OF REVIEW
¶ 8. Before reciting the standard of review, we note that there was some disagreement among the parties as to whether the doctors' Rule 12(b)(6) motions were converted to Rule 56 motions by the introduction of matter outside of the pleadings. While we agree with the doctors' contention that the introduction of matter extrinsic to the pleadings, but used in formulating the pleadings, does not automatically convert a Rule 12(b)(6) motion into a Rule 56 motion, we find that the motions here were converted into Rule 56 motions. Sennett v. U.S. Fidelity and Guar. Co., 757 So.2d 206, 209 (¶¶ 10-11) (Miss.2000). However, we do not believe that the result in this case would be different were we to treat the motions as 12(b)(6) motions.
¶ 9. Having found that the motions at issue are to be treated as motions for summary judgment, the applicable standard of review is, therefore, de novo. Hudson v. Courtesy Motors, Inc., 794 So.2d 999, 1002(¶ 7) (Miss.2001). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). "The evidence must be viewed in the light most favorable to the [] party against whom the motion has been made." Hudson, 794 So.2d at 1002(¶ 7). In addition, the moving party bears the burden of demonstrating that no genuine issue of material fact exists. Lewallen v. Slawson, 822 So.2d 236, 237(¶ 6) (Miss.Ct.App.2002).

DISCUSSION
¶ 10. As stated above, Russell's primary argument under this issue is that a fact issue existed on the question of due diligence, and that the judge improperly invaded the province of the jury. In support of this argument, Russell cites two cases: In re Catfish Antitrust Litigation, 826 F.Supp. 1019, 1031(¶ 14) (N.D.Miss. 1993) and Robinson v. Cobb, 763 So.2d 883, 889 (¶¶ 37-38) (Miss.2000). Our examination of these cases leads us to conclude that they do not support Russell's arguments.
¶ 11. The In re Catfish Antitrust Litigation case fails to support his argument for two reasons. First, that case dealt with a price fixing scheme, not a latent injury/medical malpractice claim; therefore, that case is readily distinguishable. Second, the In re Catfish case stated, contrary to plaintiff's assertions, a rather stringent requirement to exercise due diligence in the context of a specific claim of fraudulent concealment. The court said:
In order to avail the doctrine of fraudulent concealment and its equitable tolling of the statute of limitations, the plaintiffs must show that they failed, despite the exercise of due diligence on their part, to discover the facts that form the basis of their price fixing claim. "[T]he statute of limitations is tolled only until such time as the plaintiff, exercising reasonable diligence, could have discovered the facts forming the basis for the claim." Allan Construction Co., *365 851 F.2d at 1533. The plaintiffs need not have actual knowledge of the facts before the duty of due diligence arises; rather, knowledge of certain facts which are "calculated to excite inquiry" give rise to the duty to inquire.

In re Catfish, 826 F.Supp. at 1031 (emphasis added).
¶ 12. The In re Catfish case, thus, stands for the proposition that in order to prevail on a claim of fraudulent concealment a plaintiff has a duty to have exercised due diligence. Id. This means that if a plaintiff has failed to exercise due diligence, he does not have a claim for fraudulent concealment. Moreover, and very significantly, the In re Catfish court states that "plaintiffs need not have actual knowledge of the facts before the duty of due diligence arises; rather, knowledge of certain facts which are `calculated to excite inquiry' give rise to the duty to inquire." Id. (emphasis added). Both of these aspects of the In re Catfish holding argue against reversing the judgment of the circuit court, because the record reveals facts that almost certainly should have been calculated to excite inquiry on the part of Russell.
¶ 13. Another problem with plaintiff's citation to this case is apparent from the court's statements. The court is discussing due diligence specifically in the context of a claim of fraudulent concealment. As the trial court and the doctors correctly note, Russell did not state facts that would demonstrate some affirmative act of concealment on the part of the doctors, the first requirement for a claim of fraudulent concealment. Id. At most, the record reflects that Dr. Williford may have misdiagnosed Russell's left leg condition, but there is nothing to indicate that the misdiagnosis was anything other than a mistake. Thus, since Russell did not state sufficient facts to make out a claim for fraudulent concealment, his citation to In re Catfish, a case specifically dealing with fraudulent concealment, is misplaced.
¶ 14. Robinson v. Cobb, 763 So.2d 883 (Miss.2000) is also distinguishable. Specifically, the Robinson court held that a fact issue existed as to whether the defendant engaged in affirmative acts of concealment. Id. at 888(¶ 25). Significantly, however, the plaintiffs in Robinson put forth proof that one of the defendants had lied about his involvement in the automobile accident forming the basis of the lawsuit. Id. Thus, in Robinson the plaintiff stated facts and put forth proof of affirmative acts of deception and/or fraud.
¶ 15. In addition, on the question of due diligence the facts in Robinson are distinguishable. In Robinson, roughly two weeks after the incident, the plaintiffs hired a private investigator to try to determine all of the parties involved in the accident. Id. at 885(¶ 11). The investigator labored for several years in an attempt to locate all of the possible defendants; however, despite his efforts, the plaintiff was not able to discover the involvement of a key defendant, Cobb, until roughly four years after the accident. Id. at 888 (¶¶ 27-36).
¶ 16. Both of these circumstances in Robinson, namely the showing of affirmative acts of concealment and due diligence, make that case stand in stark contrast to the case sub judice. Here, Russell made no showing of any affirmative acts of concealment, nor did Russell take any investigative actions that could be described as due diligence. Thus, the cases relied upon by Russell to support his argument lend him little support, given the material we find in the record.
¶ 17. In short, the trial court did not err in finding that Russell failed to exercise due diligence. While the cases discussed above do stand for the proposition *366 that sometimes the questions of due diligence and discovery can create factual issues, in this case there are no disputed fact issues on the question of due diligence.

II. DID THE TRIAL COURT ERR IN APPLYING THE 1998 VERSION OF THE STATUTE OF LIMITATIONS FOR MEDICAL MALPRACTICE?
¶ 18. Russell argues that the correct statute of limitations to be applied to this case is the version of Mississippi Code Annotated § 15-1-36 in effect in 1976. Russell argues that the 1976 version contained a more liberal discovery rule and standard for determining accrual that would allow his action to proceed, even though it was brought twenty-seven years after the alleged act or omission.
¶ 19. The doctors argue that, by Russell's own assertions, the applicable statute of limitations is the version as amended in 1998. This argument runs: Russell insists that his action did not accrue until 2000, and the 1998 statute, by its own terms, applies to actions accruing after July 1, 1998. Miss.Code Ann. § 15-1-36(2). Thus, argue the doctors, under his own theory Russell has placed his action under the 1998 statute, which contains a seven year statute of repose. The seven year statute of repose runs from the date the alleged act or omission occurred, and this clearly bars Russell's action, which was filed twenty-seven years after the alleged act or omission.

STANDARD OF REVIEW
¶ 20. "`This Court uses a de novo standard of review when passing on questions of law including statute of limitations issues.' Stephens v. Equitable Life Assur. Society of U.S., 850 So.2d 78, 81 (Miss. 2003) (quoting ABC Mfg. Corp. v. Doyle, 749 So.2d 43, 45 (Miss.1999))." Alexander v. Womack, 857 So.2d 59, 62(¶ 10) (Miss. 2003).

DISCUSSION
¶ 21. We find the issue of whether the trial court erred in applying the 1998 version of the statute to be without merit, because we find that this action would be barred under either version of the statute. Thus, even accepting that the 1976 statute should have applied, Russell's action would still be barred.
¶ 22. The case of Kilgore v. Barnes, 508 So.2d 1042 (Miss.1987), cited by Russell, provides a helpful illustration of how the 1976 version of the statute is applied. That version of the statute reads in relevant part: "[§ 15-1-36] subsection (1): `the date the alleged act, omission or neglect shall or with reasonable diligence might have been first known or discovered.'" Id. at 1045 (emphasis added).
¶ 23. In the Kilgore case, the plaintiff continued experiencing chest pains after he underwent heart surgery. Id. at 1044. Because of this he received numerous chest x-rays and other tests from various different doctors. Id. Unfortunately, it took the patient roughly eight years to find a doctor who was able to detect the true problem: a surgical needle had been left in the lining of his heart. Id. The Kilgore court found the patient's action to be timely, setting the time of accrual as the date the patient discovered the needle, because the patient had exercised due diligence for years trying to determine the nature of his continuing heart problems. Id. at 1045.
¶ 24. This is perhaps the most significant thing about the Kilgore case for our purposes: its illustration of what constitutes due diligence. The patient in the Kilgore case sought and received numerous tests and procedures from numerous doctors in the years following his surgery and, in spite of the diligence he exercised in seeking to determine the nature of his *367 continuing heart problems, he was unable to discover the true source of the problem until eight years after the fact. Id. at 1044. The court found that, as was readily apparent from his course of action post surgery, the patient could not have known of the true nature of his problem, even though he exercised reasonable diligence. Id. at 1045. Those facts stand in stark contrast to the facts of the case sub judice, where Russell failed to seek further treatment or second opinions until twenty-seven years after the fact.
¶ 25. A straightforward application of the due diligence standard, as illustrated in the Kilgore case, clearly supports affirming the lower court's grant of summary judgment. Russell's leg, post surgery, was noticeably turned or protruding to the left. Put another way, Russell had an abnormal, post-operative condition of which he was aware immediately after surgery in 1973. Russell demonstrated his knowledge of this abnormal post-operative condition in his leg by inquiring with Dr. Williford about the condition. Dr. Williford suggested that the problem was muscular and could be cured with physical therapy. Russell took this advice; however, physical therapy did not fully correct the problem.
¶ 26. The 1998 version of the statute reads in relevant part:
(2) For any claim accruing on or after July 1, 1998, and except as otherwise provided in this section, no claim in tort may be brought against a licensed physician, osteopath, dentist, hospital, institution for the aged or infirm, nurse, pharmacist, podiatrist, optometrist or chiropractor for injuries or wrongful death arising out of the course of medical, surgical or other professional services unless it is filed within two (2) years from the date the alleged act, omission or neglect shall or with reasonable diligence might have been first known or discovered. ...
Miss.Code Ann. § 15-1-36 (emphasis added).
¶ 27. We note that the language relating to when the statute begins to run in both versions is identical: when the alleged act or omission might have been first known or discovered through reasonable diligence. Id. Thus, since the Kilgore court applies language identical to that of the 1998 version, we find the analysis of reasonable or due diligence in that case to be equally applicable under the 1998 version. But our more recent case of Simpson v. Lovelace, 892 So.2d 284 (Miss. Ct.App.2004) which specifically applied the 1998 version of the statute, provides a helpful analysis of the issue of reasonable diligence.
¶ 28. The facts of the Simpson case are nearly identical to the facts of the case sub judice. There, the plaintiff brought a medical malpractice action, alleging that the defendants negligently operated on his right leg. Id. at (¶ 1). In that case, as in the case sub judice, the plaintiff failed to file his action within the two year limitations period prescribed by Miss.Code Ann. § 15-1-36. The plaintiff argued that he did not discover or know of his claim until several years after the surgery and that, therefore, the statute of limitations did not begin to run until he discovered his injury. Id. at (¶ 5).
¶ 29. In affirming the circuit court's grant of summary judgment, we noted that the plaintiff had a visible, post operative abnormality in his right leg after surgery. Id. Specifically we declared, "[the plaintiff] knew from the very beginning, following the procedure performed by Dr. Lovelace, that something was not quite right." Id. at (¶ 10). The condition began immediately after surgery and persisted for three years, after which time the plaintiff obtained *368 a second opinion indicating that the surgery was negligently performed. Id. at (¶ 9). On the question of reasonable diligence we also noted, "if [the plaintiff] is to prevail he must show that he, using reasonable diligence, could not have discovered Dr. Lovelace's negligence." Id. at (¶ 13). The similarities between the Simpson case and the case sub judice are striking, and we find that case to be directly on point.
¶ 30. When we view the above in the light of a motion for summary judgment we find in the record that it is undisputed that Russell experienced a visibly abnormal, post-operative condition that led him to take corrective measures, pursuant to Dr. Williford's instructions; however, these corrective measures were not entirely successful and the condition persisted. In this case, then, we have a situation very similar to Simpson, yet even more compelling, given the amount of time involved here: Russell knew that there was something wrong with his left leg immediately after the surgery, and he knew that the condition persisted for years after surgery. Therefore, in the absence of fraudulent concealment by the doctor, Russell's action accrued immediately after or very soon after surgery.
¶ 31. But even if we assume for argument's sake that the turn or twist in his left leg by itself did not give Russell notice of a potential claim for accrual purposes (a questionable proposition, at best), we would still find that, at the very least, after the physical therapy recommended by Dr. Williford failed to fully correct the problem, due diligence would have prompted Russell to seek a second opinion or some further additional treatment, as other, reasonably diligent patients have done before. Kilgore, 508 So.2d at 1044. In other words, Russell could have discovered the true problem if he had exercised due diligence after the physical therapy failed to correct the problem; therefore, his action accrued, at the latest, sometime soon after the physical therapy proved ineffective and after he failed to further investigate the condition of his leg. This conclusion follows from the fact that the standard under either version of the statute is what might have been discovered through due diligence.
¶ 32. Therefore, we find that there was no reversible error in the circuit court's application of the 1998 version of the statute of limitations, since the circuit court's ruling was based upon Russell's failure to exercise reasonable or due diligence.

III. DID THE TRIAL COURT ERR IN FAILING TO CONSIDER THE AFFIDAVITS PRESENTED IN OPPOSITION TO THE APPELLEES' MOTIONS TO DISMISS?
¶ 33. Russell argues that the trial court failed to consider two affidavits filed in opposition to the doctors' motions to dismiss and that this failure constituted reversible error. The doctors argue that Russell failed to object at the summary judgment hearing and failed to seek a continuance for the purpose of obtaining affidavits under M.R.C.P. 56(f); therefore, argue the doctors, Russell may not validly raise this issue now on appeal.

STANDARD OF REVIEW
¶ 34. As noted under our discussion of the first issue, we employ de novo review of matters relating to summary judgment. Hudson, 794 So.2d at 1002(¶ 7).

DISCUSSION
¶ 35. The record reveals that the trial judge issued an oral ruling from the bench on June 12, 2003, the day of the hearing, granting the doctors' motions to dismiss. On June 18, 2003, Russell filed a motion to reconsider and included with that motion *369 two affidavits in opposition to the doctors' motions. On June 23, 2003, the court filed its order of dismissal, noting that the court was "fully advised in the premises." As noted, Russell argues that this order was deficient, because it allegedly failed to consider the affidavits he filed after the hearing.
¶ 36. We find Russell's argument on this issue to be unpersuasive, and we agree with the argument of the doctors. The doctors correctly point out that the affidavits in question were filed after the hearing had already been conducted and the judge's bench ruling declared. Noting the timing of the filing of the affidavits, the doctors cite to the case of Koestler v. Mississippi College, 749 So.2d 1122, 1125(¶ 10) (Miss.Ct.App.1999). The Koestler court declared:
A litigant desiring to avail herself of the right to present more evidentiary material has an affirmative duty to timely raise the issue with the trial court or be deemed to have waived objection to the court proceeding on the motion. MST, Inc. v. Miss. Chemical Corp., 610 So.2d 299, 305 (Miss.1992). In that case, the Mississippi Supreme Court pointed out that Rule 56(f) provides that a party opposing a summary judgment motion who "cannot for reasons stated present by affidavit facts essential to justify his opposition...." must file an affidavit to that effect in order to claim her right to a continuance to obtain such affidavits or to pursue further discovery. M.R.C.P. 56(f).
Id.
¶ 37. We find that principle from the Koestler case to be applicable here. If Russell was indeed fully aware that the posture of the motions had changed to that of summary judgment and desired to submit affidavits, he was required to object or move for continuance at the hearing. Id. Our review of the record indicates that Russell took no such action. Therefore, any objection he may have had to the way the court conducted the hearing on the motion for summary judgment has been waived. Id.
¶ 38. Before concluding we note another significant thing about these affidavits, given the dissent's argument that a fact question exists on the issue of pain: the affidavits are inconsistent with factual representations made in the complaint. For instance, in his complaint Russell states, "Over the years, after the surgery by Dr. Williford, Mr. Russell's left knee intermittently caused him problems.... He also experienced severe pain periodically to his knee area...." Yet, puzzlingly, Russell's affidavit states, "Subsequent to the 31st day of July, 1973, I experienced no unusual pain to my left thigh or femur.... At no time subsequent to 1973 did I experience any pain to my left leg or any portion thereof which would put me on notice...." In contrast to these inconsistent statements made by Russell, the record demonstrates that the doctors never disputed any factual representations on the issue of pain. For example, in Dr. Williford's separate answer and motion to dismiss, he admits the allegations in the complaint to the effect that Russell experienced pain periodically after the surgery.
¶ 39. Therefore, we do not find the record to establish a genuine issue of fact regarding pain, because the only disputed factual theories on the subject of pain were presented by Russell himself, not the doctors. Moreover, even if we were to accept that a fact issue exists on the issue of pain, we can not say that the question of pain was a material fact for accrual purposes under the statute of limitation.
¶ 40. While there may be some question as to whether and to what extent Russell may have been in pain because of the post-operative *370 condition of his left leg, given the visible and persistent nature of the turning of his left leg, we cannot say that the presence or absence of pain "matters in an outcome determinative sense" on the issue of accrual. Wingerter v. Brotherhood Productions, Inc., 822 So.2d 300, 302(¶ 6) (Miss.Ct.App.2002). This is because, whether there was pain or not, the undisputed fact remains that Russell knew that there was something wrong with his left leg and that the physical therapy recommended by Dr. Williford was not fully effective. The undisputed material facts could have led the lower court to the legal conclusion that there was no genuine issue of material fact on the question reasonable diligence and discovery of the injury.

CONCLUSION
¶ 41. The material facts in this case are undisputed: Russell knew immediately after surgery that something was wrong with his left leg. Moreover, he lived with this condition for close to thirty years. This condition was apparent immediately after surgery; it was frequently, if not always visible; it was at least sometimes painful; and it was not completely remedied by Dr. Williford's prescribed treatment, physical therapy. If the reasonable diligence standard in our statutes of limitations means anything, it must mean that patients should be reasonably diligent in investigating post-operative abnormalities that persist for years after surgery.
¶ 42. What that should mean in the case sub judice is this: reasonable diligence would have led Russell to seek a second opinion or additional treatment many years ago when the abnormal condition in his left leg persisted, even after physical therapy. This simple action, if taken within one to two years after surgery instead of twenty-seven years after, might have made the true problem with Russell's leg known a long time ago. The problem with Russell's leg might have been discovered through reasonable diligence immediately after or very soon after the surgery; therefore, Russell may not bring this action now, over a quarter of a century after the alleged act or omission. To allow Russell to proceed under this set of facts on such an ancient claim would set a very dangerous precedent.
¶ 43. For the foregoing reasons, the judgment of the Circuit Court is affirmed.
¶ 44. THE JUDGMENT OF THE CIRCUIT COURT OF FORREST COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
BRIDGES AND LEE, P.JJ., GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, C.J. AND CHANDLER, J.
IRVING, J., Dissenting.
¶ 45. The majority finds that there is no genuine issue of material fact regarding whether Rhett Russell, utilizing reasonable diligence, might have known or discovered before June 2000 the alleged negligence of Dr. Williford in the misalignment of Russell's left leg after a car accident which left Russell's leg severely fractured. Consequently, the majority finds no need to determine whether the 1976 or the 1998 version of the statute of limitations applies.
¶ 46. In my judgment, it is important to determine the applicable statute of limitations. Therefore, this dissent covers that issue. Further, notwithstanding Russell's long delay in discovering his cause of action, this is not an appropriate case for summary judgment, because there are material issues of fact regarding whether Dr. Williford concealed his alleged acts of negligence *371 and whether Russell was put on notice that he might have a medical negligence claim against Dr. Williford stemming from the 1973 surgery performed by the doctor. Applicable case law requires that these issues be resolved by a jury. See Robinson v. Cobb, 763 So.2d 883, 888-89 (¶¶ 25, 38) (Miss.2000) (holding that questions regarding concealment and due diligence are fact questions to be resolved by the jury). Therefore, I respectfully dissent. I would reverse and remand for a jury trial in which the jury would be instructed to determine if Russell, using reasonable diligence, might have known or discovered his alleged claim against Dr. Williford prior to the date of actual discovery in June 2000.
¶ 47. In July 1973, Russell was admitted to Forrest General Hospital in Hattiesburg for corrective surgery on his left femur as a result of a car accident.[1] In his complaint Russell alleged that following the surgery, he periodically experienced severe pain in his knee area over the years. During the motion hearing, Russell testified to some facts slightly different from what he had alleged in his complaint.
¶ 48. During the hearing of the Appellees's motion to dismiss, Russell testified that immediately after the surgery, during one of Dr. Williford's daily visits to him, he asked Dr. Williford if Dr. Williford put Russell's leg on sideways. Dr. Williford's response was, "physical therapy will straighten your foot out." When Russell inquired of the reason for the leg being turned, Dr. Williford explained that "we had to cut you from the knee to the top of your hip, and when we cut all of those muscles, it pulled your leg to the left, but it would be remedied by physical therapy." Russell stated that, on more than one occasion, Dr. Williford assured him that this would be remedied with physical therapy.
¶ 49. As to what happened after physical therapy, Russell testified during direct examination as follows:
I went through physical therapy, and they taught me to just pull the front of my foot to the front.... At all times subsequent thereto I was able to keep my toes to the front.... If I became really tired, exhausted, it would swing back to the left. I never at any time had any pain to my left femur unless, say, a cold front or rain was coming in, and at the  same time my right wrist would hurt.... Never had any problems to my leg itself. Eventually I had some problems on one occasion with my knee, but I was hiking in the bitter root mountains of the Rockies, and it went out  stranded on one day, but the next day it was okay. I never had any reason to go to a doctor on my leg until my knees started hurting so badly. I finally went to a doctor who informed me, and I learned for the first time, that my knee went out because my leg had been set sideways.
Following Russell's direct examination, the following exchange occurred:
THE COURT: My question, Mr. Russell, after physical therapy, did your left foot continue to protrude to the left?
THE WITNESS (Russell): No, sir. Only when I was totally exhausted. In the evening I would catch it swinging to the left. But if I ever caught it swinging to the left, I'd pull it back. And it was only when I just was exhausted and wasn't paying attention. But people that knew me and during the course of a normal day would never know that I had a problem with my left leg. And the *372 only problem I did have with my left leg, if I got tired, it would swing to the left. So my leg never turned to the left unless I was exhausted, late in the evening. And that wasn't every day. It was just on occasion I would catch myself with my knee  my leg going off to the left.
¶ 50. In June 2000, Russell met with orthopedic surgeon Dr. Clyde Phillips for treatment of severe pain in his knees. Russell claims that at that time Dr. Phillips informed him that the rotation of his foot was caused by the misalignment of his femur during the 1973 surgery and that this resulted in problems with his knee.
¶ 51. I first address the statute of limitations issue. The crux of Russell's argument is that the trial judge erred in concluding that the statute of limitations had run out on his medical negligence claim. Russell contends that he did not become aware that he had an actionable injury until June 2000, when Dr. Phillips informed him of Dr. Williford's negligence. He maintains that as a result, the statute began to run at that particular time. Russell further contends that Dr. Williford and his co-defendant fraudulently concealed that his left femur had not been properly aligned.
¶ 52. Dr. Williford and his co-defendant filed motions to dismiss based upon the statute of limitations defense. However, the trial court considered matters outside of the pleadings, thereby transforming their motions to dismiss into summary judgment motions pursuant to M.R.C.P. 56.
¶ 53. The law is well established with respect to the grant or denial of summary judgments. A summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). "All that is required of an opposing party to survive a motion for summary judgment is to establish a genuine issue of material fact by the means available under the rule." Lowery v. Guaranty Bank and Trust Co., 592 So.2d 79, 81 (Miss.1991) (citing Galloway v. Travelers Ins. Co., 515 So.2d 678, 682 (Miss.1987)). "In determining whether the entry of summary judgment [is] appropriate, [the appellate court] reviews the judgment de novo, making its own determination on the motion, separate and apart from that of the trial court." Lowery, 592 So.2d at 81. "The evidentiary matters are viewed in the light most favorable to the nonmoving party." Id. "If after this examination, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, then summary judgment is affirmed, but if after examining the evidentiary matters there is a genuine issue of material fact, the grant of summary judgment is reversed." Lowery, 592 So.2d at 81(citing Newell v. Hinton, 556 So.2d 1037, 1041 (Miss.1990)).
¶ 54. At a hearing on the matter, the trial judge applied the fraudulent concealment provision in Mississippi Code Annotated section 15-1-36(2)(b), and found that in order for Russell's suit to go forward twenty-seven years after the surgery, Russell would have to prove that the defendants engaged in fraudulent concealment and that he had used reasonable diligence in an attempt to discover his claim.
¶ 55. Under Mississippi Code Annotated section 15-1-49 (1972), the general catch-all six year statute of limitations in existence at the time of Russell's surgery, a claim accrued on the date of the wrongful act. Kilgore v. Barnes, 508 So.2d 1042, 1044 (Miss.1987) (citing Smith v. McComb Infirmary Association, 196 So.2d 91, 92-93 (Miss.1967)). Therefore, under this *373 statute, Russell's claim would have become barred in July 1979. However, "[i]n 1976, the Mississippi Legislature enacted [Section 15-1-36,] a [specific] statute of limitations for medical malpractice tort claims." Kilgore, 508 So.2d at 1044. "That statute provided for a two-year limitations period, and the concept of accrual was redefined so that the statute [did] not begin to run until `the date the alleged act, omission or neglect shall or with reasonable diligence might have been first known or discovered.'" Id. (quoting Smith v. Sanders, 485 So.2d 1051, 1052-53 (Miss.1986)).
¶ 56. When Section 15-1-36, the specific medical negligence statute of limitations, was first enacted in 1976, Russell's claim was still viable. It is the general view that the legislature has the authority to enlarge periods of limitation with respect to claims not barred at the time of elongation, but may not give retroactive effect to newly enacted statutes of limitations shortening the period within which a claim arising prior to enactment must be brought. Barnes, 508 So.2d at 1045 (citing Dan River, Inc. v. Adkins, 3 Va.App. 320, 349 S.E.2d 667, 669 (1986); Perkins v. State, 487 So.2d 791, 792 (Miss.1986)). Therefore, the 1976 statute extended the time period within which Russell's claim had to be filed by postponing until the date when Russell, utilizing reasonable diligence, could have discovered his claim irrespective of the amount of time it took to discover the claim. "This is consistent with our general principle that an act remedial in its character embraces claims existing when the [new] act [is] passed." Kilgore, 508 So.2d at 1045 (citing Excelsior Mfg. Co. v. Keyser, 62 Miss. 155, 158 (1884)).
¶ 57. Section 15-1-36 was amended in 1989 to provide a provision relating to minors, but the general provision for nonminors remained unchanged. Then, in 1998, the legislature amended Section 15-1-36 to create a statute of repose for medical negligence actions and to create fraudulent concealment and foreign objects exceptions. The amended statute, which is the current version, provides that all claims "accruing after July 1, 1998, ... [must] be filed within two (2) years from the date the alleged act, omission or neglect shall or with reasonable diligence might have been first known or discovered, and, ... in no event more than seven (7) years after the alleged act, omission or neglect occurred...." Miss.Code Ann. § 15-1-36 (Rev.2003). For claims based on fraudulent concealment, and on foreign objects left in a person's body during a surgical or medical procedure, the time of accrual was defined as beginning at the time, and not before, the concealment or foreign object is, or with reasonable diligence should have been, first known or discovered.
¶ 58. I find that the 1998 statute would not apply to Russell's claim because that statute imposes a restriction on his claim by placing a seven-year cap from the date of the injury, notwithstanding the fact that the claim may not have been discoverable within seven years although due diligence may have been utilized. The instant case does not involve an object left in the body, and since, under the 1976 statute, concealment was not a factor to be considered in determining the date of accrual, it cannot be utilized in an analysis to shorten the period of time accorded to Russell by the 1976 statute in which to file his claim, and neither can it be used as a condition of granting Russell the period of time already granted him by the 1976 statute in which to file his claim. It may, however, be considered in the "due diligence" analysis, that is, whether any acts of concealment on the part of Dr. Williford hindered, affected, or impacted Russell's efforts to discover the existence of his claim against Dr. Williford.
*374 ¶ 59. It first should be noted that Dr. Williford relies solely upon his interpretation of the statute of limitations to support his argument that Russell's suit is time barred. He does not contest Russell's assertion that Dr. Williford told him that physical therapy would remedy the problem, but even if he had contested this fact, such contestation would have resulted in a fact question to be resolved by the jury. Robinson, 763 So.2d at (¶ 25). Further, it seems to me that whether physical therapy remedied the problem, as contemplated by Dr. Williford, is an open question not answered by the record before us, leading me to conclude that a material question of fact remains and that the answer to this fact question is indispensable to the determination of the greater issue, that is, whether Russell was on notice following physical therapy that Dr. Williford was likely concealing the truth from him regarding what had really transpired during the 1973 surgery. Again, this is a fact matter for resolution by a jury.
¶ 60. Robinson, along with In Re Catfish Antitrust Litigation, 826 F.Supp. 1019 (N.D.Miss.1993), are cited by Russell in support of his argument that summary judgment was inappropriately granted. The majority's attempt to distinguish Robinson and In Re Catfish demonstrates the problem with the majority's decision, that is, in order to reach its decision it must decide, as did the trial judge, a question of fact, that is, that the turning of Russell's foot was sufficient notice to invoke his duty of due diligence.
¶ 61. The majority attempts to distinguish In Re Catfish by explaining that In Re Catfish deals with a price fixing scheme, not a latent injury/medical malpractice claim. While In Re Catfish does deal with a price fixing scheme, it also deals squarely with the question as to when a plaintiff's duty of due diligence arises, a central issue in our case. The majority then further fails to deal with the clear teachings of In Re Catfish by stating that In Re Catfish stands for the proposition "that in order to prevail on a claim of fraudulent concealment, a plaintiff has a duty to have exercise due diligence." Well said, but this assertion represents only partially what In Re Catfish really stands for. In Re Catfish clearly states that the duty of due diligence does not arise until the plaintiff has knowledge of certain facts which are calculated to excite inquiry. Then and only then is the duty to inquire invoked.
¶ 62. For summary judgment to be proper here, the facts must show that there is no genuine issue relating to whether Russell possessed knowledge of certain facts which were calculated to excite inquiry. Otherwise, under the holding in In Re Catfish, his due diligence obligation never arose. It is at this point in the majority's analysis that it decides the fact question, that is, whether the turning of Russell's foot after he was exhausted and fatigued, was sufficient knowledge to invoke Russell's duty to inquire. As I have already noted, the majority, by its holding, answers this question in the affirmative. In my judgment, this is a question for the jury, especially given the nature of Russell's injury prior to the surgery. Many individuals are left with some permanent limping, twisting, etc. after perfectly performed surgery to correct serious traumatic injury to limbs of the body. How can it be said that a lay person possesses sufficient knowledge to know or have reasons to suspect that a limb has not been properly repaired when the repairing doctor gives what seems to be a perfectly logical explanation for the resulting deformity, that is, that the twisting was the normal result of having to cut all of the muscles from the knee to the thigh?
*375 ¶ 63. That physical therapy was not a hundred percent effective in correcting the problem is not a sufficient basis for finding that Russell was on notice. First, it is not clear what Dr. Williford meant when he said that physical therapy would remedy the problem. He never explained, and if he never told Russell that, how can the post-physical therapy results be held against Russell? Second, how was Russell to know, without the benefit of some medical knowledge on his part, that physical therapy had not been successful in light of the fact that he received considerable benefit from it?
¶ 64. The majority also attempts to distinguish the Robinson facts by asserting that the plaintiff in Robinson took affirmative steps to determine the identity of all of the parties involved in the automobile accident which formed the basis of the lawsuit. Moreover, this analysis fails to take into account that in Robinson there were rumors circulating immediately after the automobile accident that the plaintiffs' decedents, who were killed in the accident, were being chased by another vehicle and that the defendant was the person driving the chase vehicle. Robinson, 763 So.2d at 887(¶ 21). Thus, the plaintiffs in Robinson possessed sufficient knowledge to invoke their duty to inquire and they diligently carried out their duty. It is, therefore, not a proper analysis of Robinson to look only at the affirmative steps taken by the Robinson plaintiffs after their duty to inquire was invoked. This fact is highlighted by how the Robinson court dealt with the defendant Robert Cobb's argument that the plaintiffs were on inquiry notice of his involvement in the accident only weeks after the accident and that this notice triggered their duty of due diligence. The court, citing In re Catfish, answered Cobb's argument simply by stating that "[w]hether the duty is triggered at the time of notice inquiry is a fact question properly left for a jury." Robinson, 763 So.2d at 889(¶ 37). Thus, the majority's finding that the turning of Russell's foot placed him on notice and thus triggered his duty of due diligence finds no support in Robinson for the notion that this circumstance makes summary judgment appropriate.
¶ 65. Russell's pleadings and testimony do not make clear whether he was on notice that there was a problem that would invoke his responsibility to use reasonable diligence. For example, if we accept the allegations in Russell's complaint as true, one could conclude that Russell was put on notice that he had a potential claim, and therefore should have exercised reasonable diligence in discovering that claim. However, if we accept as true Russell's testimony, and the allegations in his affidavit, that he did not experience any unusual pain, then one could conclude that no evidence existed that would have put him on notice of a potential claim other than the turning of his foot to the left when he was tired and exhausted.
¶ 66. If Russell experienced periodic pain after the surgery, it seems to me that it is reasonable to conclude that at least a question of fact exists as to whether this was sufficient to invoke his statutory duty of reasonable diligence to discover. On the other hand, if he suffered no pain or other discomfort, then it is reasonable to conclude that he had no basis to believe that he might have a claim unless the rotation of his foot alone was sufficient to invoke the duty of reasonable diligence. At least that proposition appears reasonably debatable. In either case, it was a question to be determined by the jury.
¶ 67. The majority relies upon Kilgore to support its flawed analysis regarding due diligence. I do not think that the facts in Kilgore provide any guidance for the resolution of the issue here which is whether on these facts, it can be said that *376 Russell without a doubt was on notice such as to invoke his statutory reasonable diligence obligation. In Kilgore, Dr. Thomas L. Kilgore, Jr. performed coronary artery bypass surgery on Woodrow Wilson Barnes on June 28, 1974. Apparently, during the surgery, a metallic surgical needle was left in the lining of Barnes's heart. The needle was not discovered until June 21, 1982. Kilgore, 508 So.2d at 1043. However, "[d]uring the ensuing years Barnes often complained of weakness and pain similar to the angina pains he had experienced prior to the surgery." Id. at 1044. Several chest x-rays taken in the interim did not reveal the presence of the needle or if they did, no one told Barnes about its existence. Id.
¶ 68. In our case, Russell's own pleadings raise an issue of fact as to whether he suffered pain following the 1973 surgery. Secondly, according to Russell, Dr. Williford told Russell that the turning of the foot was normal given the type of surgery performed and that physical therapy would remedy the problem. Physical therapy did in fact remedy the problem to an extent. The question then becomes whether Russell, a lay person, was placed on notice following physical therapy that physical therapy had not done what Dr. Williford told him that it would do, thereby warranting Russell's pursuing a second medical opinion. I believe that this is a question for the jury, and since it involves a material issue of fact, summary judgment was inappropriate.
¶ 69. The majority also invokes our holding in Simpson v. Lovelace, 892 So.2d 284 (Miss.Ct.App.2004). What the majority fails to properly appreciate is that the facts of our case today are materially different from the facts in Lovelace. In Lovelace, beginning with the date of the operation and continuing until the alleged negligence was discovered, the plaintiff suffered from pain, swelling, numbness and ulcers on his right leg at the site of the surgery. Here, there is mixed evidence whether Russell suffered any pain after his operation. Certainly, there were no numbness, swelling, or ulcers.
¶ 70. While it may appear unreasonable in light of the time interval involved to hold that Russell's lawsuit should not be time barred, such holding is made possible by the legislature's decision in enacting a medical negligence statute in 1976 with such a broad window of opportunity in which to file medical negligence claims. Apparently, recognizing the potential for just this sort of case, the legislature in 1998 narrowed the window by placing a seven year cap for bringing medical negligence cases, except in those cases involving fraudulent concealment and foreign objects being introduced during a surgical or medical procedure. Despite the long interval involved here, it is not our place to do anything other than apply the law to the facts as presented.
¶ 71. For the reasons presented, I respectfully dissent.
KING, C.J., AND CHANDLER, J., JOIN THIS SEPARATE WRITTEN OPINION.
NOTES
[1] A year later, Dr. Williford performed a second surgery on Russell to remove hardware inserted in Russell's thigh during the first surgery.