# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2024-CA-00690-SCT

*ANGELA RENEE GARTMAN JONES*

*v.*

*JAMES RICHARD JONES*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/13/2024 |
| TRIAL JUDGE: | HON. TAMETRICE EDRICKA HODGES-LINZEY |
| TRIAL COURT ATTORNEYS: | MATTHEW THOMPSON |
| | CHAD KENNETH KING |
| | H. BYRON CARTER, III |
| | ANGELA GRAY MARSHALL |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | MATTHEW THOMPSON |
| | CHAD KENNETH KING |
| ATTORNEY FOR APPELLEE: | H. BYRON CARTER, III |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; VACATED AND REMANDED IN PART - 04/02/2026 |
| MOTION FOR REHEARING FILED: | |

## CONSOLIDATED WITH

## NO. 2024-CA-01307-SCT

*IN RE: ANGELA RENEE GARTMAN JONES*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/06/2024 |
| TRIAL JUDGE: | HON. TAMETRICE EDRICKA HODGES-LINZEY |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | MATTHEW THOMPSON |
| | CHAD KENNETH KING |
| ATTORNEY FOR APPELLEE: | H. BYRON CARTER, III |

| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 04/02/2026 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**RANDOLPH, CHIEF JUSTICE, FOR THE COURT:**

¶1. Of the issues raised in this consolidated appeal, this Court addresses two. They are the chancellor's decisions to hold Angela Gartman Jones in contempt and separately to sanction one of her attorneys, Matthew Thompson. Angela makes a number of claims, many of which are now moot. For this Court's consideration is whether (1) the trial court's sanctions against Thompson were improper; (2) the trial court erred by enforcing the 2015 court's ordering Angela to pay James back for the medical debt of Angela's child by another man; (3) this Court should order the chancellor to permanently recuse from all cases involving Angela Jones, Matthew Thompson, Chad King, and any attorneys associated with the Thompson Law Firm, PLLC; and (4) this Court should refer the chancellor to the Mississippi Commission on Judicial Performance for her actions.

## FACTS AND PROCEDURAL HISTORY

### I. Before 2022: Divorce and First Petition for Contempt

¶2. James and Angela Jones had one child in 2009, H.J., before their 2011 divorce. After the divorce, James and Angela shared joint legal custody of H.J., and Angela exercised primary physical custody. James was to receive visitation on Tuesdays and Thursdays and every other weekend. James also was to get four nonconsecutive weeks of summer visitation

and standard alternating holiday visitation.

¶3.     In 2015, on James's complaint, chancellor Denise Owens found that "based on Angela's own testimony," Angela interfered with James's visitation for more than three years so that "James had not enjoyed one full weekend of visitation with [H.J.] since August 2012." Chancellor Owens also ordered Angela to remove her other son from James's insurance and to "resolve this . . . in such a way that will hold James harmless in satisfying" $6,000 in medical debt charged to James. No appeal was taken from this order.

## II.     2022: James's Second Petition for Contempt

¶4.     On June 14, 2022, James filed a petition for contempt against Angela for refusing to allow reasonable visitation. James asked that the court find her in contempt, "incarcerate her . . . to assist with compelling an understanding of the necessity to follow the Court's Judgments and to allow James time to make up for lost visitation[,]" and "alter or amend the physical custody of the minor child, if necessary . . . ." (Emphasis added.)

¶5.     On August 9, 2022, James filed an amended petition for contempt. The amended complaint included a claim for $5,472.96 Angela owed James for the 2015 medical debt incurred for Angela's child from another marriage.

¶6.     At the end of her term in 2022, Chancellor Owens retired after many years of distinguished service. Chancellor Hodges-Linzey was then elected and would be assigned James's 2022 petition for contempt.

## III.     2023: Agreed Temporary Order

¶7.     On April 18, 2023, the parties agreed to a temporary order that would progressively

increase James's visitation to what the 2011 divorce judgment required. Chancellor Hodges-Linzey approved.

¶8.     On May 12, 2023, within one month of the temporary order and less than a week after the first visitation on May 6, Angela filed an emergency motion to suspend all visitation because of concerns regarding the May 6 visit.[1] In that motion, she admitted that the visit "was James [sic] *first* visit with [H.J.] in approximately *six (6) years*." (Emphasis added.)

### IV.     May 13, 2024: First Hearing

¶9.     One day later, a hearing was held on James's petition for contempt, and in attendance were the parties and H.J.'s guardian ad litem, Angela Gray Marshall. James was the first witness. He testified that he received very few visitations over the years, and the few visitations he had received went poorly due to Angela's interference.[2] During cross-examination, James accused Angela and her attorney of presenting an incomplete set of text messages to falsely show that he did not respond to Angela's texts about visitation. The chancellor also examined James, asking specific questions about what visitations he received each year. Following the trial court's examination, Thompson further cross-examined James.

---

[1]Angela claimed H.J. did not want to visit James's home; H.J. did not like how his father wanted to play pool with him; James told H.J. that people live in the Matrix; James claimed COVID-19 was not real; H.J. yelled, "[a]ll you did was talk bad about my mom and lie" at James as the visitation ended; and "James asked [H.J.] for his phone number, which [H.J.] refused to give to James."

[2]For example, in April 2017, Angela did not pick up H.J. at the agreed time, so James took H.J. back to James's house. Angela called the police saying James was "refusing to bring [H.J.] back from visitation," so three officers went to James's house with weapons drawn. In June 2017, Angela filed a complaint against James with Rankin County Child Protection Services because H.J. was sunburned after spending a few hours at a water park.

4

¶10.    Next, James called Angela adversely. During that cross-examination, Angela admitted she had not paid James the money as ordered in Chancellor Owens's 2015 order; she did not give James visitation after the three-hour visit in 2023; she had not given James six consecutive weeks of visitation each summer since 2015; and she had not given James four nonconsecutive weeks of summer visitation since 2011.

¶11.    When James's attorney asked whether Angela had an order from the trial court allowing her to withhold visitation, Angela testified:

> A: I was told at that point that visitation was stopped.

THE COURT: By who?

THE WITNESS: By the lawyers. I've done everything that they've told me to do.

THE COURT: By the lawyers you hired?

THE WITNESS: Yes, ma'am.

THE COURT: Did they provide you with a copy of an order signed by the Judge stating that you no longer had to exercise visitation?

THE WITNESS: No, ma'am. And the counselor also advised me, but no, ma'am.

THE COURT: So you [sic] listening to everybody but the Court?

THE WITNESS: I thought I was listening to the Court, but I will do better.

THE COURT: Because I don't talk through attorneys.

THE WITNESS: I get it. I understand.

THE COURT: I don't talk through a counselor. I talk on the record and I talk through orders that are entered.

THE WITNESS: Yes, ma'am.

[James's counsel]: May I proceed, Your Honor?

THE COURT: So what you're saying is your attorney is responsible for you not allowing visitation for 2023 after the Court entered its order saying the visitation had to take place?

THE WITNESS: Yes, ma'am. After that, we met with [the counselor]. And we were not told that we were to meet again. And that was on pause, and that's when we met with the GAL also. But I was never told -- the dates that we were told to meet him, I met him. I did not have anything otherwise and I did ask for others. I did send emails asking for orders.

THE COURT: So who should I -- who should the Court hold responsible for the 2023 visitation, you or your attorney or both?

THE WITNESS: I would have done whatever I had been asked to do because that's what I had done when you asked me to. That's what I did.

THE COURT: So you're saying that from the 2023 order, the way it was listed, Mr. Jones was supposed to have visitation for a couple hours on a Saturday and it was supposed to progress to Saturdays and Sundays. And then it was supposed to go back to how it was originally agreed upon in the divorce proceedings. Did you do any of that? Did you allow visitation to take place in any manner the way it was described in that order in 2023 after April?

THE WITNESS: I have not seen that order.

THE COURT: You have not seen --

THE WITNESS: No, ma'am.

THE COURT: -- the order from last year. The one you agreed to, the one you-all brought to the Court and said this is our agreement?

THE WITNESS: No, ma'am. I did the dates I was told and then we were told it was put on hold because of the situation.

At no point in the May 13, 2024 hearing did Thompson object to the chancellor's inquiry, nor did he dispute Angela's testimony.

6

¶12. At the conclusion of James's examination of Angela, the chancellor inquired as to whether Thompson would further examine the witness. He declined, saying, "[r]eserve, Your Honor." James then rested his case-in-chief.

¶13. Angela then called H.J., who was then age fifteen, to the stand. H.J. displayed a deep animosity towards James. H.J. admitted that he wanted "to use the counselor to help to fix it so [he did not] have to see [his] dad again."

¶14. When James's counsel concluded his examination of H.J. at about 7:00 p.m. and before Angela rested her case, the chancellor stated that "[w]e're going to stop right here. The Court is going to talk with the parties." She then stopped herself and gave the GAL an opportunity to speak. The GAL said that while Angela's conduct was egregious, she advised against changing custody because of H.J.'s hostility toward James. The chancellor found that Angela disobeyed the two judges's orders and provided no good excuses for doing so. As a result, she incarcerated Angela for thirty days to enforce compliance and to make up for lost visitation, and she granted custody to James. She also ordered Angela to pay James as ordered by Chancellor Owens in 2015.

¶15. Regarding the conditions of Angela's release, the chancellor hand wrote, "June 14, 2024 Angela Gartman can be released, which is 30 days for visitation. During this time, Angela Gartman is to pay $5,472.96 in full prior to June 14, 2024 release, and release all medical [and] educational information to the father."[3]

V. **May 20-28, 2024: First Show-Cause Order and Hearing**

---

[3]H.J.'s medical and educational information is not at issue in this appeal.

7

¶16.    A week later, May 20, 2024, James's attorney sent an email to the court, Angela's counsel, and the GAL reporting that Angela's parents had not returned H.J. to James by the May 18 deadline. Attached were texts from Angela's mother reading, "James, [t]his is out of my hands. *It is my understanding that* [*H.J.'s*] *court appointed GAL has suggested to the court that this weekend would not be a desirable time for* [*H.J.*] *to begin.* You may want to contact that person." (Emphasis added.)[4] That same day, the chancellor issued a show-cause order directing "all parties herein as well as the maternal grandparents and the minor child to appear . . . to give reasons, if any, why they should not be held in contempt . . . ."

¶17.    Two days later, James filed his response to the show-cause order. It read that H.J. was returned to James before the deadline. He also said James's attorney would be absent from the hearing because he would be before a court in Bolivar County.

¶18.    At the show-cause hearing on May 28, 2024, the chancellor began by asking where Thompson was since he was absent. Chad King said he was present on behalf of the Thompson firm. The chancellor turned her attention toward the maternal grandmother, letting her "off with a warning."

¶19.    The chancellor then returned her attention to Thompson's absence. King informed her that Thompson was on his son's senior school trip in North Carolina and would be back later that week. King confirmed that Thompson did not tell the court he would be absent. The chancellor then said:

---

[4]At the hearing, Angela's mother revealed that she was referring to a motion for reconsideration filed by the GAL two days after the May 13 hearing. In it, the GAL asked the court to reconsider "requiring [H.J.] to live with his father at this time."

We're going to go ahead and enter a show-cause for him to appear next Monday, 8:30 a.m.

In the meantime, I want to make the attorneys who are present aware that filing a motion in any case that's assigned to Courtroom 3 does not supercede [sic] any order that has been entered in this matter. . . . [J]ust because you file a motion, it does not mean it supercedes [sic] any orders. All orders must be followed. Are we -- are we clear?

. . . .

And make sure you make these parties aware of that. We will not -- I am extremely concerned that for a whole year, a father and a son could have gotten their relationship back on track, *but because an attorney decides to file a motion and then tell his client . . . she didn't have to follow the order of the Court because he filed a motion*, we don't do that here. *And then I saw that there was going to try to repeat itself by way of the guardian ad litem.*

Attorney Marshall, I've worked with you in the past, so I know that's not the manner in which you operate. But I wanted to be sure and make it very clear on the record. Make sure any of these litigants you dealing with, they know they have to still follow the orders of the Court, no matter what motions you may file on their behalf because they may have a grievance or they feel like they want to see something happen.

The GAL vigorously defended herself, saying she "never spoke to the grandparents at all or led anybody to believe that they could not follow the Court's order."

¶20.   That same day, May 28, 2024, the chancellor entered a written show-cause order directing "Thompson to appear . . . on Monday, June 3, 2024 . . . to give reasons, if any, why he should not be held in contempt for his failure or refusal to comply with [the first show-cause order]."

**VI.    June 3, 2024: Second Show-Cause Hearing**

¶21.   On June 3, 2024, Thompson filed a written response to the chancellor's second show-cause order, contending that King had appeared in Thompson's stead as counsel of record,

9

Thompson was out of town for his son's senior trip to North Carolina, the show-cause order did not specifically require his presence, and Angela was excused from attending. Later that same day, Thompson physically appeared and reasserted the points in his written response and said, "I wasn't willfully trying to violate any court order. I made sure it was covered. Didn't want to continue the matter. Just wanted to have it addressed. Mr. King was able to handle it and address it."

¶22.   The chancellor then explained:

> THE COURT: Well, when this Court issues show cause, everybody show up [sic].
>
> MR. THOMPSON: Yes, Your Honor.
>
> THE COURT: And if you cannot show up for some reason, usually most people, at least, send an email to at least try to cover themselves. I understand you say you have a law partner and he came in to -- he's come in to cover you.
>
> But in this situation, I wanted to -- the Court wanted to speak with you directly, not with your law partner.
>
> MR. THOMPSON: I understand that now, Your Honor, and it won't happen again.
>
> THE COURT: Okay. Now, one of the main reasons for this show-cause hearing was that the Court heard something very concerning during the full-day hearing in this matter. One of those concerning things outside of visitation never having happened since 2011 was that your client, Ms. Gartman, made the -- well, *she stated on the stand* during her direct testimony when the Court was examining her that . . . once you filed your emergency petition to terminate visitation or to stop visitation, *that she was told that she did not have to follow this Court's order to continue visitation in this matter*.
>
> And when the Court inquired further by asking, "Well, who told you you didn't have to do that?"
>
> She stated, "*my attorney*."

10

And *she also looked over to you, and I also looked over at you as well*, and you had your head down. You didn't make eye contact.

And then *when I continued to inquire even further, she persisted that you told her that she did not have to follow this Court's order* that was entered last year regarding the visitation of the minor child.

That's extremely concerning to the Court. This case is unique in that visitation -- the mother has not allowed visitation. She's been really good at doing that on her own.

*And you-all made an agreed order.* Y'all came to your own agreement about visitation. *And then she stated that she didn't have to follow it because you had filed a motion on her behalf.*

The Court was going to let this behavior go until after it had a full-day hearing, the maternal grandmother attempted to do the exact same thing, but through the guardian ad litem.

The difference between you and the guardian ad litem was that the guardian ad litem made it very clear to the Court, "No, I never contacted that maternal grandmother. I don't even know her. I'm here strictly for the minor child to represent the best interest of the minor child. And I only filed the motion due to the communications I had with the minor child and just doing my job."

But you, on the other hand, when your client sat in that stand in that witness box and made those accusations, *you never once tried to come against it*. You never once responded in any kind of way.

Usually, attorneys will stand before the Court and make some response and tell the Court, no, that's not what happened. Instead, you sat with your head down especially when I asked should I hold you responsible for not obeying the Court's order or should I hold your attorney responsible or should I hold you both responsible?

And at that point, she really didn't have a response. She was looking to you, and you did not provide one.

Because I take orders being entered by a Court very seriously. Even as a practicing attorney, I always tried to make sure I followed those orders because those are important. It gives us our directions.

11

See a motion, it requests relief, but an order, it tells us all what we're going to do. And then when we don't follow those orders, the law gives the Judge the authority to then move forward in any way or any way proscribed [sic] by law to bring the parties into compliance.

It pains me to have to do what I'm about to do to you in this matter. And that is to sanction you. Yes, you are a good attorney and you represent your clients and you do your work, and you don't give the Court a hard time.

But in this case, I do recall warning the parties after you-all did not follow the order of the Court that was entered last year, *I do recall warning the parties and warning you-all at great length to obey the order that you-all brought to the Court asking the Court to sign and to put into law and you-all did not do it*.

And so I have to hold you responsible, and *I'm going to sanction you* $1500 to be *paid into the court registry* by this Thursday at 12 noon. If it's not paid, we will happily take you into custody.

And then I will do whatever I need to do to suspend your bar license if you feel that this Court isn't serious about the sanction. Please do not, this case or any other case, think that you can file a motion or not -- or just tell your client flat out they don't have to follow an order of this Court. That's not your job.

. . . .

So you are hereby sanctioned to pay $1500 to the court registry by Thursday, 12 noon. If not, we'll place you into custody, and I'll move forward with the proceedings to have your license suspended.

(Emphasis added.)

¶23.   The following exchange occurred moments after:

MR. THOMPSON: May I respond to the Court's concerns?

THE COURT: You may, but the sanction still stands.

MR. THOMPSON: I understand that, Your Honor. Just a couple of things.

Number 1, Ms. Gartman-Jones was never advised to not follow any of

12

this Court's orders. And I can say that uncategorically [sic].

Ms. Gartman-Jones was not ever questioned by me at that hearing. As the Court recalls, we stopped about 7:00 p.m. and so she was never under direct examination by me. And the Court instructed us to get another day in October to come back and finish the hearing.

THE COURT: Let me stop you right there because the Court does not have short-term memory. The last witness this Court heard from was the minor child in this matter. The mother -- the father testified at great length and then the mother testified.

MR. THOMPSON: She was called adversely. I'm not arguing, Your Honor. She was called adverse then I reserved to call her in our case-in-chief. And that hasn't happened yet.

THE COURT: Well, at this point, the Court heard all it needed to hear, and the Court made its observations at that time as I've made known on this record.

I have had plenty of attorneys to come in here where their client may say well, I provided to my attorney and their attorney will stand – their attorney has stood with you, stood, and said, I'm sorry, Your Honor, I don't have that information. I have never been in possession of that information.

And so you did not make any steps to contest what she said. And I extensively examined her on that issue by itself.

MR. THOMPSON: My only response is I was following procedure maybe over substance in that instance

THE COURT: Okay. Well, we won't tarry on this and we won't belabor it. That will be the order of the Court.

¶24.    On the same day, June 3, 2024, the trial court issued a written Order Imposing Sanctions on Thompson. According to the order, "Thompson has failed without good cause to comply with the orders of this Court," and the trial court "set forth on the record the conduct on which imposition of the following sanction is based and the reasons why the Court found the failure to comply without good cause." The trial court sanctioned Thompson

13

$1,500, which he paid on June 6, 2024, before he appealed.

**VII. Post-June 3, 2024: Appeals and Relinquishment of James's Parental Rights**

¶25. On June 11, 2024, the twenty-ninth day of her incarceration, Angela filed a certificate of compliance showing she paid James the $5,472.96 she owed per the order by Chancellor Owens in 2015.

¶26. On June 12, 2024, before James relinquished his parental rights on October 28, 2024, Angela appealed the Order of Incarceration entered on May 13, 2024, and the Order Imposing Sanctions entered on June 3, 2024. On July 30, 2024, Angela filed an amended notice of appeal that also appealed the Order of Contempt and Temporary Order of Custody entered on July 2, 2024, and the No Contact Order and Counseling Order entered on July 2, 2024.

¶27. On October 28, 2024, the trial court held a status conference hearing. James addressed the chancellor, informing her that H.J. had completely rejected all reunification efforts. As a result, James said he thought "it would be best if I relinquish my rights." Based on his and the GAL's testimony, the chancellor granted James's request to relinquish his parental rights.

¶28. On November 6, 2024, after James relinquished his rights, Angela appealed the Order Denying Motion for Recusal entered on November 6, 2024. This Court consolidated the appeals on June 24, 2025.

**STANDARD OF REVIEW**

¶29. This Court has held:

Contempt issues are questions of law that are decided on a case-by-case basis.

14

The determination of the standard of review begins with whether the contempt is criminal or civil. If the contempt is civil in nature, the scope of review is the manifest-error rule. If the contempt is criminal in nature, the scope of review is *ab initio*.

*Seals v. Stanton*, 350 So. 3d 1051, 1058 (Miss. 2022) (citations omitted).

¶30. Here, James did not file a brief for this Court's consideration, which has been treated as "tantamount to confession of error[.]"[5] *Dennis v. Dennis*, 234 So. 3d 371, 374-75 (Miss. 2017) (quoting *Sanders v. Chamblee*, 819 So. 2d 1275, 1277 (Miss. 2002)). The issues appealed are not between Angela and James, but Angela and her counsel and the chancellor. Because James has no interest in the issues appealed, we do not apply the confession-of-error principle.

## ANALYSIS

¶31. James relinquished his parental rights. Thus, the issues preserved for appeal are whether (1) the trial court's sanctions against Thompson were improper; (2) the trial court's enforcing the 2015 order that Angela pay James back for the medical debt of Angela's child by another man; (3) this Court should order the chancellor to permanently recuse from all cases involving Angela Jones, Matthew Thompson, Chad King, and any attorneys associated with the Thompson Law Firm, PLLC; and (4) this Court should refer the chancellor to the

_____

[5]This Court has made an exception for cases that directly involve child custody and support as well as "suit[s] wherein those issues are of concern and its resolution affects the economic balance between the non-custodial and the custodial parent." *Barber v. Barber*, 608 So. 2d 1338, 1340 (Miss. 1992). In such cases, "our practice is to make a special effort to review the record for support for affirmance." *Id.* (citing *Sparkman v. Sparkman*, 441 So. 2d 1361 (Miss. 1983); *Garceau v. Roberts*, 363 So. 2d 249 (Miss. 1979)); *Doe v. Smith*, 200 So. 3d 1028, 1032 n.12 (Miss. 2016). This case cannot influence child custody or support between Angela and James because James relinquished his parental rights. As a result, the exception does not apply.

Mississippi Commission on Judicial Performance for her actions.

**I.      Some issues raised on appeal were mooted because James relinquished his parental rights.**

¶32.   This Court has previously held that:

"[c]ases in which an actual controversy existed at trial but the controversy has expired at the time of review, become moot. We have held that the review procedure should not be allowed for the purpose of settling abstract or academic questions, and that we have no power to issue advisory opinions."

*J.E.W. v. T.G.S.*, 935 So. 2d 954, 959 (Miss. 2006) (alteration in original) (quoting *Monaghan v. Blue Bell, Inc.*, 393 So. 2d 466, 466-67 (Miss. 1980)). As a result, "[t]his Court will not adjudicate moot questions." *Allred v. Webb*, 641 So. 2d 1218, 1220 (Miss. 1994) (quoting *Monaghan*, 393 So. 2d at 467).

¶33.   Because James terminated his parental rights, which resolved the case in Angela's favor, the only issues in controversy are whether the trial court's sanctions against Thompson were improper and whether the trial court erred by enforcing the 2015 order that Angela pay James back for the medical debt of Angela's child by another man. Without supporting her requests with law or argument, Angela also asked this Court to order the chancellor to permanently recuse from all cases involving Angela Jones, Matthew Thompson, Chad King, and any attorneys associated with the Thompson Law Firm, PLLC, and to refer the chancellor to the Mississippi Commission on Judicial Performance for her actions.

**II.     Whether the trial court's citation of contempt against Thompson was improper.**

¶34.   This Court has held that:

[t]he first step in a contempt matter is to determine whether the contempt is

16

criminal or civil in nature. ***Hanshaw v. Hanshaw***, 55 So. 3d 143, 147 (Miss. 2011). "[I]n classifying a finding of contempt as civil or criminal, this Court focuses on the *purpose* for which the power was exercised." ***In re McDonald***, 98 So. 3d 1040, 1043 (Miss. 2012) (emphasis added) (quoting ***Cooper Tire & Rubber Co. v. McGill***, 890 So. 2d 859, 867-68 (Miss. 2004)).

***Seals***, 350 So. 3d at 1059.

¶35.    The purpose of a civil contempt order is to "enforce a private party's rights or compel compliance with a court's order." ***Id.*** (emphasis omitted) (internal quotation marks omitted) (quoting ***Hanshaw***, 55 So. 3d at 147). "Such orders . . . classically provide for termination of the contemnor's sentence upon purging himself of the contempt." ***Id.*** (alteration in original) (internal quotation marks omitted) (quoting ***Newell v. Hinton***, 556 So. 2d 1037, 1044 (Miss. 1990)). "Civil contempt usually involves an act towards another party . . . ." ***Id.***

¶36.    On the other hand, the purpose of criminal contempt penalties are "to 'punish the contemnor for disobedience of a court order[.]' In other words, a punishment is entered for a past offense that interfered with a judge's ability to administer judgment." ***Id.*** (alteration in original) (citations omitted) (quoting ***In re Hampton***, 919 So. 2d 949, 954 (Miss. 2006)). "Conduct amounting to criminal contempt must be directed against the court or against a judge acting judicially rather than individually." ***Id.*** (quoting ***Purvis v. Purvis***, 657 So. 2d 794, 797 (Miss. 1994)).

¶37.    If the matter is about criminal contempt, "the second step is to determine whether the contempt is direct or constructive (indirect)." ***Id.*** at 1060 (citing ***In re Hampton***, 919 So. 2d at 955).

¶38.    Direct criminal contempt involves "words spoken or acts . . . which take[] place in the

17

very presence of the judge making all the elements of the offense personal knowledge" *Id.* (quoting *Varvaris v. State*, 512 So. 2d 886, 887-88 (Miss. 1987)). A trial court may summarily punish a direct criminal contemnor "without affidavit, pleading, or formal charges" because "no evidence or proof other than the court's own knowledge is required." *Id.* (quoting *Varvaris*, 512 So. 2d at 887-88).

¶39.    On the other hand, constructive criminal contempt is an "act . . . done beyond the presence of the court." *Id.* (internal quotation mark omitted) (quoting *Lawson v. State*, 573 So. 2d 684, 686 (Miss. 1990)). In constructive criminal contempt cases, "defendants must be provided with procedural due process safeguards, including a specification of charges, notice, and a hearing." *Id.* (internal quotation mark omitted) (quoting *Moulds v. Bradley*, 791 So. 2d 220, 225 (Miss. 2001)). As a result, a chancellor must give the contemnor notice of the charge and then recuse from the constructive criminal contempt proceeding. *In re McDonald*, 98 So. 3d at 1045-46; Miss. R. Civ. P. 81(d)(2), (5). Failing to issue a Rule 81(d) summons for a constructive criminal contempt hearing would violate the contemnor's due process rights and requires reversal of the contempt judgment. *In re McDonald*, 98 So. 3d at 1044-45. Failure to issue a Rule 81(d) summons offends due process, and "[c]omplete absence of service of process . . . cannot be waived." *Id.* at 1045 n.19 (first alteration in original) (emphasis omitted) (internal quotation marks omitted) (quoting *Dennis v. Dennis*, 824 So. 2d 604, 609 (Miss. 2002)).

¶40.    Generally, "a party's failure to appear before the court . . . constitutes constructive contempt because the party's actions and reasons are yet to be known to the court." *Seals*,

18

350 So. 3d at 1060 (citing *Wyssbrod v. Wittjen*, 798 So. 2d 352, 360 (Miss. 2001)). "[H]owever, if an attorney informs the court in advance that they will not appear for the hearing and then fail to appear for that hearing, the court possesses knowledge of the attorney's lack of appearance, and the contempt in that case can be classified as direct." *Id.* at 1060-61 (citing *Wyssbrod*, 798 So. 2d at 360).

¶41.     Here, the chancellor sanctioned Thompson but did not call Thompson's actions contempt.[6] First, the chancellor sanctioned Thompson for failing to appear at the show-cause hearing. Because he did not alert the court to his absence before the hearing, his failure to appear was constructive criminal contempt. *Seals*, 350 So. 3d at 1060 (citing *Wyssbrod*, 798 So. 2d at 360).

¶42.     Second, the chancellor sanctioned Thompson for telling Angela that she did not need to follow the visitation order; this also amounted to constructive criminal contempt. The contempt is criminal because the chancellor imposed the sanction to punish Thompson for former actions, as shown by her focus on his perceived disobedience to the court. *Id.* at 1059. Further, the contempt was constructive because she did not witness Thompson tell Angela to disobey the visitation order; rather, she heard that he gave such advice from Angela's testimony. Any such putative advice to Angela would be constructive criminal contempt.

¶43.     However, the record presents no evidence that Thompson was properly noticed for a constructive criminal contempt proceeding, and he could not waive the error by his failure to properly object. *In re McDonald*, 98 So. 3d at 1045. The chancellor also violated

---

[6]This Court has found that punishing a party for disobeying a court order is contempt even if the trial court declines to call it contempt. *McGill*, 890 So. 2d at 868.

Thompson's due process rights by not recusing from the constructive criminal contempt proceeding, although Angela did not raise this issue at the trial level or on appeal. ***Corr v. State***, 97 So. 3d 1211, 1214 (Miss. 2012). As a result, this Court vacates the chancellor's Order Imposing Sanctions and remands the case for the chancellor to recuse from the contempt proceeding. The chancery clerk also is ordered to return the $1,500 to Thompson.

III. **Whether the trial court erred by enforcing the 2015 court's ordering Angela to pay James back for the medical debt of Angela's child by another man.**

¶44. At no point before the trial court was an objection raised concerning the court's 2015 order requiring Angela to reimburse James the money from the medical debt of Angela's child by another man. "It is well-settled that issues presented for the first time on appeal are procedurally barred from consideration." ***Lewis v. Forest Fam. Prac. Clinic, P.A.***, 124 So. 3d 654, 658 (Miss. 2013) (citing ***Est. of Myers v. Myers***, 498 So. 2d 376, 378 (Miss. 1986)). To compound the procedural bar, Angela cited no case law in support of her contention, nor does she cite any law when she first addresses a lack of opportunity to defend in her brief. This Court has long treated failure to cite applicable case law in an appellate brief as a procedural bar to consideration on appeal. ***Landrum v. Livingston Holdings, LLC***, 396 So. 3d 1026, 1047 (Miss. 2024) (quoting ***Rex Distrib. Co., Inc. v. Anheuser-Busch, LLC***, 271 So. 3d 445, 452 (Miss. 2019)); ***Hale v. State***, 191 So. 3d 719, 724 n.1, 728 (Miss. 2016) (citing ***Grey v. Grey***, 638 So. 2d 488, 491 (Miss. 1994)); ***McClain v. State***, 625 So. 2d 774, 781 (Miss. 1993) (citing ***Smith v. Dorsey***, 599 So. 2d 529, 532 (Miss. 1992); ***R.C. Petroleum Co., Inc. v. Hernandez***, 555 So. 2d 1017, 1023 (Miss. 1990); ***Brown v. State***, 534 So. 2d

1019, 1023 (Miss. 1988); *Shive v. State*, 507 So. 2d 898, 900 (Miss. 1987); *Read v. S. Pine Elec. Power Assn.*, 515 So. 2d 916, 921 (Miss. 1987); *Pate v. State*, 419 So. 2d 1324, 1326 (Miss. 1982)).

¶45.    Notwithstanding the procedural bar, this issue is without merit. Angela contends that what the trial court imposed was a monetary sanction. However, the trial court ordered Angela to pay James what she owed him from Chancellor Owens's July 2, 2015 order from nearly nine years before, which had never been appealed. Angela admitted on the stand that she owed James the money and that she had not paid him. She also provided no justification at the hearing or in subsequent motions for why she did not pay James. This is not a sanction; this is merely enforcement of an order that Angela had disobeyed for nine years. As a result, this issue is without merit.

      **IV.    Whether this Court should order the chancellor to permanently recuse from all cases involving Angela Jones, Matthew Thompson, and any attorneys associated with the Thompson Law Firm, PLLC.**

¶46.    Angela's request that this Court order the chancellor to recuse from this case is moot because James terminated his parental rights.[7] However, Angela also requested that this Court order the chancellor "be permanently recused from all cases involving Angela Jones, Attorney Matthew Thompson, Attorney Chad King and any and all attorneys associated with the Thompson Law Firm." Angela neither cites any law nor makes any argument supporting this request, which this Court treats as a procedural bar to consideration on appeal. *Landrum*,

---

[7]This remains true despite reversing and remanding. This Court is only remanding the constructive criminal contempt finding against Thompson, which requires the chancellor to recuse in this case regardless. *In re McDonald*, 98 So. 3d at 1045-46.

21

396 So. 3d at 1047 (quoting ***Rex Distrib. Co., Inc.***, 271 So. 3d at 452). Further, this Court has never permitted such an action; this Court will not begin to do so now. If Angela or her attorneys perceive that the chancellor is biased against them in any cases they may have before her, they must file a motion to recuse according to the facts of that case. UCRCCC 1.15; UCCR 1.11; M.R.A.P. 48B.

V.     **Whether this Court should refer the chancellor to the Mississippi Commission on Judicial Performance for her actions.**

¶47.    Angela neither cites any law nor makes any argument supporting this request, which this Court treats as a procedural bar to consideration on appeal. ***Landrum***, 396 So. 3d at 1047 (quoting ***Rex Distrib. Co., Inc.***, 271 So. 3d at 452). Notwithstanding, "[a]ny . . . litigant, attorney, . . . or other individual who has knowledge of possible judicial misconduct may file a complaint with the Commission. Complaints may also be filed *anonymously*." Comm'n on Jud. Performance, *Filing a Complaint* (emphasis added), https://www.judicialperformance.ms.gov/filing-complaint (last visited Mar. 23, 2026). As a result, if any person feels that the chancellor engaged in judicial misconduct, he or she may report the alleged misconduct to the Mississippi Commission on Judicial Performance.

VI.     **Addressing Justice Griffis's Concerns**

¶48.    First, Justice Griffis may be correct that the chancellor erred in ways not addressed in this opinion, but those issues are moot because James terminated his parental rights to H.J., which resolved the case in favor of Angela.

¶49.    Further, for this Court to send the case back to the very same chancellor would create unnecessary costs in time and money, especially since James's termination of parental rights

resolved almost every issue. Mississippi Rule of Civil Procedure 1 puts a clear value on securing a "just, speedy, and inexpensive determination of every action." M.R.C.P. 1. The Rules of Appellate Procedure also call for "prompt, fair, and efficient administration of justice on appeal." Order Adopting M.R.A.P. As a result, this Court should not remand for further proceedings on issues not in controversy because there are no further proceedings beyond the contempt proceedings against Thompson.

¶50.    While the judge did not allow Thompson to make an ore tenus motion at the hearing, nothing prevented Thompson from objecting to any of these issues by written motion. Angela remained incarcerated for twenty-one days before Thompson became the target of the chancellor's ire, and he objected only at that point. Additionally, at no point was an attempt to appeal or seek habeas corpus raised from the Order of Incarceration to any court during her incarceration. Further, Professor Deborah H. Bell's treatise outlines four defenses to a finding of contempt, and at no point during the proceedings did Angela raise any of them. Deborah H. Bell, *Bell on Mississippi Family Law* § 14.05[2] (3d ed. 2020). A "failure to seek a definitive ruling on objections or to seek corrective action by the defendant waives the issue for purposes of appeal." ***Evans v. State***, 725 So. 2d 613, 669 (Miss. 1997) (citing ***Gayten v. State***, 595 So. 2d 409, 413 (Miss. 1992)).

¶51.    Second, Justice Griffis argues that citing the complained-of order constitutes sufficient citation of legal authority to preserve an issue for appeal. However, Justice Griffis fails to cite any authority supporting such a position. Arguments in briefs must "contain . . . citations to the authorities, statutes, *and* parts of the record relied on." M.R.A.P. 28(a)(7)

(emphasis added). The "and" shows a distinction between "authorities" and "parts of the record" for briefing purposes. *Id.*

¶52. Third, Justice Griffis only cites ***Spallone v. United States***, 493 U.S. 265, 276, 273, 110 S. Ct. 625, 107 L. Ed. 2d 644 (1990) (emphasis added), which expressly stated that the United States Supreme Court granted certiorari to address "important issues about the appropriate exercise of the *federal* judicial power against *individual legislators*." In Mississippi, "contempt matters are committed to the substantial discretion of the trial court which, by institutional circumstance and both temporal and visual proximity, is infinitely more competent to decide the matter than the Supreme Court." ***Mingo v. State***, 944 So. 2d 18, 31-32 (Miss. 2006) (quoting ***In re Williamson***, 838 So. 2d 226, 237 (Miss. 2002)).

## CONCLUSION

¶53. The visitation and custody issues were only resolved in Angela's favor before this Court received both appeals. What is left for the complaining parties are (1) the monetary sanction against Thompson, (2) the trial court's enforcing the 2015 order that Angela pay James back for another child's medical debt, (3) permanent recusal by the chancellor, and (4) whether this Court should refer the chancellor to the Mississippi Commission on Judicial Performance. The trial court erred by finding Thompson in contempt without recusing from the constructive criminal contempt proceeding and giving him proper notice. Even though Thompson did not object, "[c]omplete absence of service of process offends due process and cannot be waived." ***In re McDonald***, 98 So. 3d at 1045 (alteration in original) (emphasis omitted) (internal quotation marks omitted). As a result, this Court vacates the contempt

24

judgment against Thompson, remands the case for contempt proceedings before a different chancellor, and affirms the trial court's judgment on all other issues. The chancery clerk also is ordered to return $1,500 Thompson.

¶54. **AS TO NO. 2024-CA-00690-SCT: AFFIRMED IN PART; VACATED AND REMANDED IN PART. AS TO NO. 2024-CA-01307-SCT: AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**KING AND COLEMAN, P.JJ., ISHEE AND SULLIVAN, JJ., CONCUR. GRIFFIS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED IN PART BY COLEMAN, P.J., AND ISHEE, J. BRANNING, J., NOT PARTICIPATING.**

**GRIFFIS, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶55. Angela Renee Gartman Jones was incarcerated for failure to provide visitation and for failure to reimburse James Richard Jones $5,472 in medical expenses.[8] Chancellors have been given a significant power that should be used only after proper due process. U.S. Const. amend. XIV, § 1; Miss. Const. art. 3, § 14.

¶56. Here, the chancellor denied Angela basic constitutional due process protection. James, however, was given sufficient time and an opportunity to present his case for Angela's contempt. Yet, after James's counsel rested James's case-in-chief, Angela was allowed to call only one witness, the minor child. Angela was to be the next witness.[9] Instead, however, the chancellor abruptly announced that the matter was being recessed due to the late hour. The chancellor then ruled that Angela "never once put forth a defense or

---

[8] The medical debt was adjudicated in 2015.

[9] Angela testified in James's case-in-chief. When James's counsel concluded his questions, Angela's counsel announced he would reserve his right to question Angela during her case.

overcame the contempt brought – the petition for contempt brought against you." Subsequently Angela's counsel tried to correct this error and asked to make a motion. The chancellor responded: "You may not. We're done. Save it for MEC. We are done and please, I will hate to have to send you [to jail] with your client. Feel free to file it on MEC."

¶57. The majority dismisses this issue on the grounds that Angela's brief cited no legal authority for this proposition. I disagree. Angela's brief pointed to the chancellor's own order, dated May 13, 2024. The order cited Professor Deborah H. Bell's treatise, which provides that in contempt proceedings, "*[t]he burden then shifts to the defendant* who may rebut the prima facie case by providing inability to pay, lack of willfulness regarding the contempt, ambiguity in the order's provisions, or impossibility of performance. Deborah H. Bell, *Bell on Mississippi Family Law* § 11.05 (1st ed. 2005) (emphasis added)." Indeed, the burden shifts, and Angela should have been given an ample opportunity to call witnesses and admit evidence in her defense.

¶58. Angela was clearly not allowed an opportunity to present her defense. This is a basic and fundamental error that this Court cannot allow to stand. Professor Bell made it clear that Mississippi law requires that Angela be given an opportunity to respond to James's contempt allegations.

¶59. Accordingly, I opine that the chancellor committed manifest error in her order to incarcerate Angela for thirty-two days, lose temporary custody of her son, and sanction her attorney. I therefore dissent from the majority's decision not to review this matter. Instead, I would reverse this case and remand for further proceedings.

¶60.   Also, I am concerned by the chancellor's action. First, the chancellor caused Angela to be incarcerated longer than allowed by statute.[10] Second, she had no opportunity to appeal her order of incarceration before she was incarcerated. Third, the chancellor failed to provide Angela with basic due process—i.e., an opportunity to be heard—especially before she was incarcerated.

¶61.   Chancellors have a duty, responsibility, and obligation to ensure litigants receive their rights to be heard, present evidence in their own defense, and the right to appeal. Angela was denied these rights. Chancellors should be hesitant and reluctant to impose such a severe sanction except in the most extreme circumstances. The United States Supreme Court has ruled:

> In selecting a means to enforce the consent judgment, the District Court was entitled to rely on the axiom that "***courts have inherent power to enforce compliance with their lawful orders through civil contempt***." When a district court's order is necessary to remedy past discrimination, the court has an additional basis for the exercise of broad equitable powers. ***But while "remedial powers of an equity court must be adequate to the task, . . . they are not unlimited***." "[T]he federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *And the use of the contempt power places an additional limitation on a district court's discretion, for as the Court of Appeals recognized, "in selecting contempt sanctions, **a court is obliged to use the 'least possible power adequate to the end proposed**.'"*

*Spallone v. United States*, 493 U.S. 265, 276, 110 S. Ct. 625, 107 L. Ed. 2d 644 (1990) (alterations in original) (emphasis added) (citations omitted).

---

[10]   Mississippi Code Section 9-1-17 (Rev. 2019) provides that the chancery court "shall have power to fine and imprison any person guilty of contempt of the court while sitting, but the fine shall not exceed One Hundred Dollars ($100.00) for each offense, nor shall the imprisonment continue longer than thirty (30) days."

¶62. I concur as to the majority's decision to vacate the chancellor's order that sanctioned Angela's counsel and to decline to order permanent recusal or to refer this matter to the Mississippi Commission on Judicial Performance.

**COLEMAN, P.J., AND ISHEE, J., JOIN THIS OPINION IN PART.**